39

1  though.   That happened

2            MS HUNT:  Yes.

3            THE COURT:  I mean, this is not like a spill where the

4  pollution is continuing to migrate.

5            MS HUNT:  That's true, Your Honor.  However, the

6  State is entitled, Your Honor, under the Bankruptcy Code to get

7  a final order, even if ultimately we come back here before you

8  and can't --

9            THE COURT:  And can't enforce it

10           MS HUNT:  -- enforce it  We're entitled to get that

11 order, Your Honor.

12           THE COURT:  What are you seeking in your

13 administrative proceeding?

14           MS. HUNT:  We're seeking mitigation for the loss of 19

15 acres of freshwater wetlands, Your Honor, as well as the

16 establishment -- the reestablishment of financial assurances

17 for the monitoring and construction of the wetlands mitigation

18 bank.  And the State has filed a Motion for Summary Decision

19 The matter is pending.

20           THE COURT:  Well, is this a futile act?  I mean, is it

21 not clear that either of those could not be enforced against

22 the Debtor in light of the confirmed Plan?

23           MS. HUNT:  I don't know the answer to that question.

24 Your Honor  I don't know if it's futile or not.  But the State

25 needs to get that final order against the Trust?

*Wilter's Cramp, Inc.*
*Certified Court Transcribers*
*751 859-0191*

40

1    THE COURT:  Why?

2         MS. HUNT:  So that it's enforceable against any entity

3  that may come into possession of that property. Your Honor

4         THE COURT:  Okay  All right  Response?

5         MR. CUNNINGHAM:  Yes. Your Honor, the State is stating

6  that we're asking Your Honor to issue an injunction.  We're

7  not, we're seeking to enforce the Plan Injunction that was

8  before Your Honor at the confirmation hearing that they

9  objected.  We attached as Exhibit-A their objection to the

10  confirmation.  They simply said the Plan doesn't appropriately

11  address this issue  And that was their objection  It's a 3-

12  page -- they attached the Administrative Order.  It's a 3-page

13  objection  The Injunction was there.  The decision was before

14  the Court on enforceability of the Injunction.  And the

15  Injunction goes to holders of claims. Your Honor  What we're

16  asking Your Honor to find is that the State is holding a claim

17  as defined in the Bankruptcy Code.  The Plan defines claim

18  exactly as defined in the Bankruptcy Code  And therefore.

19  they're enjoined  Otherwise. they can do exactly what they're

20  doing  which is to not -- try to avoid the bankruptcy

21  proceedings and try  to avoid having to submit their claim in

22  those cases  They have a pre-petition claim --

23         THE COURT:  What about their seeking an order. in

24  essence. against the property or any owner of the property in

25  the future?  While they may not be able to get a money judgment

Willer's Cramp. Inc.
Certified Court Transcriber
757-559-0191

B - 181

41

1  or any recovery on that from the Debtor --

2       MR CUNNINGHAM; Obviously, Your Honor. my main

3  concern is to the extent they're going forward in seeking to

4  direct the Debtors to go out. I think as you heard counsel, to

5  perform mitigation -- and it's actually offsite mitigation that

6  they're requiring the Debtors to do -- and to go out and

7  provide monetary assurances that we will do that and get a

8  finding from an Administrative Law Judge that this Trust. as a

9  successor to Land Bank. will have to post such monetary

10 assurances and have to --

11      THE COURT: Is the Trust named as the Defendant?

12      MS HUNT: No. Your Honor  Land Bank. Inc  was named

13 as the Defendant

14      MR CUNNINGHAM: And pursuant to the Plan. all the

15 assets of the Debtors had merged with and into the Trust so --

16      THE COURT: So what?

17      MR CUNNINGHAM: Well. we have to -- again. our --

18      THE COURT: The assets are. but so what?

19      MR CUNNINGHAM: Your Honor. our primary concern is

20 that we don't have a $7 million claim being asserted against us

21 when it was clearly pre-petition  Their argument in their

22 papers is that under Torwico that they can compel the Debtors

23 to perform this offsite mitigation or perform the Trust to do

24 it  Is the State acknowledging that you do not -- you cannot

25 compel the Trust or -- are you only looking to go after a third

*Writer's Cramp, Inc.*
*Certified Court Reporters*
*731-529-0191*

42

1  party property owner that's not here?

2      MS. HUNT:  I cannot make that commitment at this

3  point. Your Honor.  We simply want to pursue our state

4  administrative action and get a final order, Your Honor, and

5  then we'll make a decision as to how to proceed at that point.

6      MR. CUNNINGHAM:  I mean, the Administrative Order goes

7  to the issue of who's responsible for the drainage of these

8  acres.  Again, since the statute allows them to order this

9  offsite mitigation, that's the relief they're going under and

10  they're saying that that's an equitable remedy that does not

11  constitute a claim because, as I just indicated, the statute

12  allows them to assess a monetary damage claim for that

13  drainage.

14      THE COURT:  Okay.

15      MR. CUNNINGHAM:  Therefore, we want to simply have a

16  finding from the Court that they are asserting a claim against

17  us and that therefore they're bound by the Plan Injunction from

18  going forward.  Otherwise we're going to have to defend this

19  State Court action.  We can be back before Your Honor again if

20  they take steps to enforce the judgment if there is a judgment

21  against us.  And we're back before Your Honor.  We believe --

22      THE COURT:  Is it premature?  Should we wait and see

23  what they seek to do with the order?

24      MR. CUNNINGHAM:  I don't think it's premature based on

25  the language of the injunction, Your Honor.  They're clearly

43

1  seeking -- I think counsel has stated, they are seeking to
2  direct Land Bank to provide this offsite mitigation, provide
3  monetary assurances    And based on the injunction -- and I can
4  read the injunction to Your Honor, in paragraph 13 19 of the
5  Plan -- and it provides that the continuation of such actions
6  is enjoined    It says here in 13 19 under Injunction, "Except
7  as otherwise expressly provided in the Plan, all persons or
8  entities who have held, hold, or may hold claims" -- and again,
9  it's claims  capital C, which is equivalent to the Bankruptcy
10  Code's definition of claims -- 'are permanently enjoined from
11  and after the effective date from commencing or continuing in
12  any matter, any action, or other proceeding of any kind on any
13  such claim    Interests against any of the Debtors, their
14  estates, reorganized IT Group, the IT Environmental Liquidating
15  Trust, the IT Liquidating Trustee, the Litigation Trust, or the
16  assets." And they are continuing an action that we're having
17  to expend money to defend when I think the evidence shows
18  clearly that this Administrative Order that they've stated  the
19  18 acres of drained wetlands, is a pre-petition claim under the
20  Bankruptcy Code.  And under the Injunction Your Honor approved
21  at the confirmation hearing, they objected, were fully
22  represented by counsel, Your Honor overruled that objection.
23        MR  COBB:  Your Honor, Richard Cobb on behalf of the
24  bank group   Your Honor may recall under the Plan my clients
25  have a pecuniary interest in the assets that are sitting in the

44

1  Trust. Granted. It's not the primary interest, but it has an
2  interest. Your Honor, the issue here is if New Jersey's able
3  to obtain this order and they're able to enforce this order
4  against subsequent owners or transferees of the property, that
5  just puts a big discount on the value of this -- of what's left
6  here. And if we have -- if we put this on the market in order
7  to sell this asset and provide for a greater distribution or
8  frankly the anticipated distribution to Creditors, that value
9  will be depressed. So it's just as if they had filed a claim
10 against the Debtors and that claim was found to be in the full
11 amount.

12        THE COURT: Just as if they had a claim against
13 property of the Debtors? Isn't the damage already done? Don't
14 we already have an Administrative Order?

15        MR. COBB: Your Honor. It's not final. The issue is
16 it's in process. The filing occurs. okay, the bankruptcy
17 filing occurs --

18        THE COURT: Yes

19        MR. COBB: The State of New Jersey had full knowledge.
20 Should have come in. Filed a claim. The claim could have been
21 adjudicated and then --

22        THE COURT: When did the administrative proceeding
23 start. pre- or post-petition?

24        MR. COBB: The administrative proceeding began post-
25 petition; I -- Your Honor, I wanted to set the table for that

Willer's Cramp, Inc.
Certified Court Transcribers
732-370-0191

45

1   because that's frankly my client's concerns is that if the
2   Court does not enforce the Injunction against the State of New
3   Jersey, it's going to depress very significantly an asset of
4   the Trust available for distribution to Creditors.   Thank you.
5   Your Honor.

6           THE COURT:   All right.

7           MR. COBB:   And frankly, Your Honor, it's a clever
8   dodge around the Injunction.   They could have come in and
9   argued this back then.   Judge, and they didn't.

10          MS HUNT:   All right.   I'd like to just point one more
11  thing again, Your Honor   Again the 3rd Circuit in the case of
12  Penn Terra vs. the Commonwealth of Pennsylvania in talking
13  about the exception in the automatic stay provision for
14  enforcement of a judgment says -- they say that that should be
15  very narrowly construed, Your Honor, to reserve as much police
16  power as the statue allows for the states. Your Honor.

17          THE COURT:   Well, first of all, we're not talking
18  about 362. we're talking about the Plan Injunction   And they
19  are two different things.

20          MS HUNT:   However, I would assume that the Plan
21  Injunction cannot contravene the Bankruptcy Code, Your Honor.
22  It's got to be consistent with the Bankruptcy Code   You can't
23  take away police powers, state powers in the Plan Injunction.

24          THE COURT:   What police interest is there with respect
25  to this property as of this date?

46

1      MS. HUNT:  We're regulating the environmental laws.
2  Your Honor --

3      THE COURT:  But the infraction occurred pre-petition.
4  It's not continuing  It happened

5      MS. HUNT:  But it's -- again. it's continuing damage.

6      THE COURT:  No.  You haven't been -- gotten recovery
7  for the damage that was already done  The wetlands were
8  destroyed already pre-petition. that's conceded

9      MS. HUNT:  The resource hasn't been compensated.  The
10 resource --

11     THE COURT:  You haven't been paid for it.

12     MS. HUNT:  Not paid. it needs to be mitigated.  It
13 needs to be restored. Your Honor

14     THE COURT:  Well --

15     MS. HUNT:  Compensation won't do it.

16     THE COURT:  -- you have a claim -- well. sure it will
17 Your statute says you can get money instead. doesn't it?

18     MS. HUNT:  Actually. I don't believe that provision --
19 as I said  I don't have the provisions with me today. Your
20 Honor  I think there's a cost recovery type of mechanism in
21 the statute

22     THE COURT:  That if you mitigate. they pay for it

23     MS. HUNT:  Correct.  But even in Kovacs and the case
24 of. I believe it was Nicolette. Your Honor. in those cases. the
25 Government had options also to seek cost recovery or to go out

Welter's Cramp, Inc
Certified Court Transcribers
731-387-0191

B - 187

47

1  and to get performance by the Debtor   In those cases. the
2  State -- or the United States in those cases. sought money
3  only. they did not seek performance.  So even though there's an
4  option in the statute. I don't think we're limited by seeking
5  performance. Your Honor

6          THE COURT:  But unfortunately I know the Nicolette
7  facts.  Again. that was a situation where the land had been
8  polluted and the piles of asbestos were till sitting there
9  And there was evidence that it was still polluting.  This is
10 different   There isn't any argument of continuing pollution or
11 migration of pollution.  This -- the deed has been done pre-
12 petition

13         MS. HUNT:  Well. once again. Your Honor. the state
14 should be entitled to get a final order against Land Bank. Your
15 Honor

16         THE COURT:  Why?

17         MR. HUNT:  So that it has something enforceable   We
18 issued an Administrative Order that's --

19         THE COURT:  How will it --

20         MS. HUNT:  -- not final at this point --

21         THE COURT:  -- be enforced?  How will it be
22 enforceable?

23         MS. HUNT:  It will be a document that will say to all
24 the world that 18 acres or 19 acres of wetlands has been
25 drained on this site.

Writer's Cramp, Inc.
Certified Court Reporters
757-329-0191

48

1       THE COURT:  Okay, so?

2           MS  HUNT:  Your Honor, it gives the state options.

3           THE COURT:  What options?  That's what I'm pressing

4    you for

5           MS. HUNT:  Yeah.

6           THE COURT:  How are you going to enforce this?  By

7    seeking a money judgment against the Trust or the Debtor?

8           MS. HUNT:  No, we would not seek a money judgment,

9    Your Honor

10          THE COURT:  By seeking an order directing them to

11   mitigate?

12          MS. HUNT:  That is one option. Your Honor

13          THE COURT:  Well, how is that enforceable in light of

14   the confirmation of their Plan?

15          MS HUNT:  Well, it might be something that the State

16   would not pursue, Your Honor   But it's entitled to have that

17   final order.

18          THE COURT:  Why?  I mean again, is this a futile act

19   or is this something that----

20          MS  HUNT·  I may very well be a futile act, Your

21   Honor

22          THE COURT:  Then why should I make the Trust defend?

23          MS. HUNT:  It has been defending for 2 years  Your

24   Honor

25          THE COURT:  That's not an answer.  I mean, I'm

49

1 struggling with the interest of the State against the interest

2 of the Debtor and its Creditors, other Creditors. I mean, it's

3 clear your claim could have been pursued as a money judgment,

4 or a claim for a money judgment.

5       MS. HUNT: My understanding is not unless the State

6 had incurred costs to do actual mitigation themselves and then

7 sued Land Bank for recovery for those costs.

8       THE COURT: Well, in that instance it's a contingent

9 unliquidated claim because the contingency, ie: the remediation

10 by the State, had not occurred. But your right to seek that

11 occurred pre-petition when the wetlands were destroyed. So it

12 would fit the definition of a claim under the Bankruptcy Code.

13 I think the 3rd Circuit cases all tell me that I have to allow

14 the State to proceed if there's a compelling State interest in

15 protecting the health and safety of its citizens. And I just

16 don't see it now with respect to your claim. The damage has

17 been done, the damage was done pre-petition.

18       MS. HUNT: But again, Your Honor, I think the 3rd

19 Circuit cases talk about distinguishing between cases where the

20 State or the United States is seeking simply money or where

21 they're seeking performance. And that that cannot be so

22 narrowly construed as to not reserve any kind of police powers

23 for the State, Your Honor.

24       THE COURT: True, but the Bankruptcy Court has to

25 accede to the State where the State has a compelling public

50

1  safety and health issue  And again. if the damage has been
2  done and there's no continuing creeping pollution that the
3  State has an interest in stopping. what compelling interest
4  does the State have that I should --
5       MS. HUNT:  I guess I have -- I have some trouble with
6  distinguishing between cases where there might be a migrating
7  pollution and where there might not be.  I mean, I think the
8  State is entitled to enforce its environmental laws. Your
9  Honor. and not get into -- into --
10      THE COURT:  You're entitled to future performance. and
11 you're entitled to an order telling them don't destroy wetlands
12 in the future  I agree  But they're not  There's no --
13 there's been no post-petition. and certainly no post-
14 confirmation. action that's destroying wetlands.  The damages
15 have already been done.  So I'm not convinced there is a
16 compelling State interest here  And to the extent you're
17 seeking to enforce your claim for the prior damage to the
18 wetlands  I think that is enjoined by the Confirmation Order
19 So I will grant the motion
20      MR. CUNNINGHAM:  Thank you. Your Honor  We'll settle
21 a form of order and submit it to the Court  Or do we have --
22 okay -- do we have that? We have an order  May I approach.
23 Your Honor?
24      THE COURT:  You may  Is this one that was attached to
25 the motion?

51

1    MR CUNNINGHAM: Yes. it is. Your Honor.

2    (Pause in proceedings)

3    THE COURT: I will enter that order then

4    MR CUNNINGHAM: Thank you. Your Honor

5    MS HUNT: Thank you. Your Honor

6    MS. CRUZ: The next item on the agenda. Your Honor.

7    are items 28 and 31. they deal with the same material    The

8    first is the non-substantive objection of the Trustee to the

9    administrative expense claim, #7058. of the Board of

10   Equalization for the State of California   And #31 is the

11   Motion for Relief from Final Judgement pursuant to Federal

12   Rules of Bankruptcy Procedure 9006 and 9024. and Federal Rule

13   of Civil Procedures 60(d) filed by California State Board of

14   Equalization

15   THE COURT: All right   Who wants to go first?

16   MS CRUZ: Your Honor. the IT Litigation Trust filed

17   an objection to the administrative claim on the basis that the

18   Board filed the objection very much past the administrative bar

19   date and -- I'm sorry --

20   THE COURT: Filed the claim

21   MS CRUZ: -- the claim -- I'm sorry. the claim, and

22   as well failed to support its claim   There were -- there was

23   no -- absolutely no indication of where -- what basis they had

24   for the claim when they filed it. so we filed an objection on

25   those two grounds. And this is -- Mr. Cunningham is going to

*Writer's Cramp, Inc.*
*Certified Court Transcriber*
*732-329-0191*

52

1  speak to the rest of the objection.

2         MR. CUNNINGHAM:  Your Honor, I don't think the facts

3  are in dispute. I think the State has filed a motion under Rule

4  60(b) to ask Your Honor for relief from the order so that they

5  could file the claim late.  I don't think there's any dispute

6  that the claim was filed after the relevant bar dates

7         THE COURT:  Okay  All right.

8         MR. MONACO:  Good morning, Your Honor. Frank Monaco --

9         THE COURT:  We should go to your motion than

10         MR. MONACO:  Excuse me, Your Honor  Good morning.

11  Frank Monaco for the State of California. Your Honor, I'd like

12  to move the admission pro hac vice of my co-counsel, Mark

13  Silverschotz from the Anderson, Kill & Olick firm  He is a

14  member in good standing of Bar of the State of New York.

15         THE COURT:  All right  It will be granted

16         MR. SILVERSCHOTZ:  Thank you, Your Honor  I'm glad,

17  Your Honor, that we've resolved the -- the who-goes-first issue

18  because, frankly, it was troubling me all weekend  Your Honor,

19  Mark Silverschotz, Anderson, Kill & Olick  Together with

20  Monzack & Monaco, we are counsel to the Board of Equalization

21  of the State of California, which is the taxing agency

22  responsible for the collection of sales taxes.  That's not to

23  be confused, as I sometimes do, with the Franchise Tax Board

24  which deals with the income taxes there.  And I think, Your

25  Honor, there's been quite a lot of paper filed considering that

53

1   at bottom we have a single claim subject to a non-substantive
2   objection. And as the Court noted, and as we all agree, these
3   two matters are closely related, both the non-substantive
4   objection and our Rule 60 Motion

5   Our Motion under Rule 60 was in two parts, but I'm gonna
6   move things a little more quickly. I believe, because while
7   looking at the file over the weekend, it became apparent that
8   really the -- and although I'm not formally withdrawing the
9   second part of the motion -- it seems that the only relevant
10  and necessary consideration is the 60(b)(1) aspect respecting
11  relief from the -- from the barred order  And the reason is
12  that one fact I discovered was that the initial order next to
13  the 363 Motion as filed by the Debtor referenced an
14  interpretation of 1146(c) that suggested that the sale would be
15  free and clear, not -- and not subject to, rather, not only
16  stamp or similar taxes; as the statute articulates, but also
17  sales taxes  In fact, it was interesting. Your Honor, because
18  in the recital -- the fact finding in the order -- there's --
19  there was no reference to sales tax, but in the decretal
20  paragraph at the end of the order, there was a reference to
21  sale tax  And this is only in the initial order as filed with
22  the motion  Go some months later, and low and behold the order
23  actually entered by Your Honor -- and I have extra copies for
24  the Court and for counsel if that would be convenient --
25            THE COURT: Yes, please hand it up.

Walter's Cramp, Inc.
Certified Court Transcribers
732-529-0191

54

1    MR. SILVERSCHOTZ:  The order as actually entered

2  merely referenced stamp, transfer or other taxes.  Your Honor,

3  if I may approach.  I don't know if you want to mark these.

4  We've previously discussed how we take judicial notice of --

5    THE COURT:  Let's --

6    MR. SILVERSCHOTZ:  -- these kinds of orders.

7    THE COURT:  Yes, let's mark it as an exhibit --

8    MR. SILVERSCHOTZ:  Okay.

9    THE COURT:  -- so there's no --

10    MR. SILVERSCHOTZ:  Your Honor, I'll make the first

11  one, then, the draft order appended to the original 363 Motion

12  and the -- we'll call that #1 -- California-1 and California-2.

13  The order approves -- under 105, 363, et cetera, approving the

14  sale.

15    (California Board of Equalization Exhibit-1 marked for

16  identification)

17    (California Board of Equalization Exhibit-2 marked for

18  identification)

19    THE COURT:  All right.  You may hand those up.  C-1

20  and C-2.  Thank you.

21    MR. SILVERSCHOTZ:  Thank you.  I'm gonna give copies

22  to my colleague.  Your Honor, I took the liberty of putting

23  green tabs on the draft and on the final order.  And on the

24  draft on paragraph 2, one can see quite clearly that there's

25  a reference to stamp tax or similar tax, which I think is the

B - 195

1  correct way of handling it. And since we were counsel to the

2  Board of Equalization of the GST case, we're very sensitive to

3  that issue. And then in paragraph 33 on page 29 of the draft

4  order, clearly it says "sale transfer or other similar tax" and

5  the -- in C-2, fact finding (x) refers to stamp or similar tax

6  tracking the draft. And paragraph 43 on page 28 makes

7  reference to stamp tax, transfer tax or other similar tax.

8      I had thought, initially, Your Honor, that we were gonna

9  have round two of the GST fight. But upon review of those

10 orders it's clear that the word "sale" -- "sales tax" had been

11 struck. I wasn't part of the case back then. I don't know if

12 it was on objection of a party or the Court's own correct

13 reading of the statute. but clearly the -- the legislative

14 history, for lack of a better term, of this -- or the evolution

15 of the order led us -- resulted in the striking of the term

16 "sales tax." And we know that a sales tax is not a transfer

17 tax in the way we think of real estate transfer tax. and the

18 GST case, of course, makes that clear.

19     So as a consequence, Your Honor, coming back to where I

20 started from, our motion under Rule 60, which we filed, was in

21 two parts. It was under 60(b)1 with respect to the Bar Order.

22 We are within one year of the Bar Order, so we can proceed

23 timely in that matter. It was under -- that was with respect

24 to the Bar Order.

25     The Sale Order, because that was more than a year ago, I

56

1  initially thought I was gonna have to proceed on a 60(b)(6),

2  which is not subject to the one year limitation, but since I

3  think -- and to counsels credit and the Trust's credit, no one

4  has really said in the responsive papers that there is a belief

5  by the estate that this sale was exempt from sales -- at least

6  as an initial matter -- exempt from sales tax under 1146(c)

7  We really should simply be proceeding under the -- under the

8  (b)(1) --

9          THE COURT:  All right

10         MR SILVERSCHOTZ:  -- prong of the argument.  Now the

11 sale, as I just said, clearly was not exempt from sales tax,

12 but the Debtor, during the course of the case, didn't proceed

13 in a manner that one ordinarily would have expected a Debtor

14 proceed, at least vis-a-vis giving notice to tax authorities of

15 certain sales.  And the sale procedure, Your Honor, as we

16 referenced in our pleadings, expressly set forth to whom notice

17 of the sale was to be given  And it expressly states that

18 Local, State, County tax authorities affected by the sale were

19 to be given actual notice of the sale, not by publication.

20 California Board of Equalization was a known, you know, known

21 Creditor here.  But the -- we went through all of the -- the

22 affidavits of service  and in fact, it appears, unfortunately,

23 that the sale order, all of the attendant proceedings, were not

24 on notice to the Board of Equalization.  And in their response

25 to our motion, again, to the their credit, I don't believe the

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

B - 197

57

1  estate argues to the contrary.

2      Secondly, the sales tax returns that were filed with

3  respect to the relevant periods make no reference whatsoever --

4  and again, it's important that we remember that the reason

5  we're here is not with respect to a pre-petition --

6          THE COURT: Yes, I understand

7          MR. SILVERSCHOTZ: -- priority claim. It is an

8  administrative expense. And I suppose that when notice of an

9  admin bar date shows up, any tax authorities could look at the

10 tax returns and see if they were paid  And the Debtor,

11 apparently, paid its sales taxes in accordance with the returns

12 that were filed, but there was no inclusion of the proceeds of

13 this sale in the relevant tax returns. And --

14         THE COURT: All right

15         MR SILVERSCHOTZ: -- at the bottom, Your Honor, the

16 sale goes through, the redacted order is entered --

17         THE COURT: I understand that

18         MR. SILVERSCHOTZ: -- the tax returns are filed and

19 California sees the tax returns. And as far as it knows  this

20 is a tax paying Debtor-In-Possession

21         THE COURT: When did you figure it out?

22         MR SILVERSCHOTZ: Your Honor, as the -- as Mr

23 Parson's declaration makes clear, I am standing here today, as

24 much as anything, by virtue of a fortuitous review  California

25 has people who go combing through the internet looking for

58

1   money    And there is a -- an employee of the Board of
2   Equalization. Ms  Bermudez. who was -- I don't know if she was
3   Googling away or what she was doing, but she stumbled across
4   this sale. either in -- I won't speculate -- but it was
5   determined that there was a sale potentially subject to
6   tax, she did some investigation.  And within less than a month
7   of the discovery. she filed the claim and the claim was filed.
8   I think. 5 or 6 days before the post-confirmation bar date
9   set by the Confirmation Order

10      Thereafter. Mr. Parsons.. who's the person in charge out in
11  California. was in communications with Mr  Soose -- I'm glad we
12  don't have to put Mr. Soose back on the stand for this.  And so
13  I don't think there's any question as to what the nature of the
14  underlying tax is and everyone knows what it is. the question
15  is whether or not the Debtor does -- you know. has to pay it or
16  not

17      THE COURT:  Okay

18      MR  SILVERSCHOTZ:  I think. Your Honor. in considering
19  the case law. it's important for us to note what the case is
20  not about   It's not about a vendor whose billing records were
21  in a state of disarray   It's not about a clerk who lost or
22  mislaid a bar notice   And happily. it's not about a law firm
23  that failed to file a Proof of Claim   We are a Creditor of the
24  post-petition period that didn't receive Court mandated notice
25  of significant proceedings before Your Honor that directly

59

1  affected us and that gave rise to a lawful, statutory, post-
2  petition liability that the Debtor failed to pay. We had some
3  brief back-and-forth in the pleadings with regard to the
4  applicability of Section 505  That's what it's -- that's the
5  way it's ordinarily done, Your Honor. I don't think anyone can
6  really dispute that. If there is a disputed tax post-petition,
7  a Debtor or Trust -- Trustee will file a 505 Motion, attach the
8  application, notice the appropriate authority, and we come in
9  and we figure it out or we do nothing, and in which case we
10  have to forever hold our peace.

11      That's not the fact pattern that we have today. We have
12  this sort of, you know, back door notice that, you know, the
13  bar date when it was received by California had the -- it was
14  like one hand clapping  There was nothing against which it
15  could be considered because there was no notice of the -- of
16  the sale and because the tax attorney said what they said  The
17  Indian Motorcycle case that we cite out of the 1st Circuit says
18  505 is the way to go, although in that case, in fairness to the
19  Trust, I have to note that was a 502(c) estimation comparison
20  But I would suggest, Your Honor, that the import of Indian
21  Motorcycle is simply that 505 is the way to go when one is
22  dealing with post-petition taxes

23      The Pecoynky case out of the Middle District of
24  Pennsylvania  I think is particularly instructive.  That was a
25  tax claim where the Internal Revenue Service didn't have notice

B - 200

60

1    that a Debtor was operating a business didn't have the FEIN

2    number and didn't have effective notice of the nature of the

3    potential claim, although that was not an admin claim. I

4    believe it was a 13 case and was dealing with pre-petition

5    taxes

6        Of course -- and this is very important, Your Honor --

7    we're here dealing with a non-substantive objection  The Board

8    of Equalization does not want to be paid more than one penny --

9            THE COURT:  Well --

10            MR. SILVERSCHOTZ:  -- of what it's due. and we're

11    happy to go over the actual merits with the Debtor.

12            THE COURT:  Well, we're not here yet, we're not here

13    on the merits

14            MR. SILVERSCHOTZ:  Absolutely not. Your Honor

15            THE COURT:  All right

16            MR. SILVERSCHOTZ:  So -- and I'm just making --

17            THE COURT:  I'm talking about -- we're only talking

18    about whether or not you get relief from the bar date

19            MR. SILVERSCHOTZ:  Correct. Your Honor.

20            THE COURT:  All right.

21            MR. SILVERSCHOTZ:  And O'Brien, you know, which I had

22    to get to sooner or later, talks about the Debtors -- the

23    estate's response which is that not withstanding everything

24    I've said, if this $845,000 is properly brought, the estate is

25    going to be prejudice because of everything that's happened in

*Writer's Cramp, Inc.*
*Certified Court Transcriber:*
*732-329-0191*

61

1   the case thus far.  And Your Honor, I read the papers and I

2   understand the argument, and it's the argument that has to be

3   made by the estate.  But O'Brien makes clear that a requirement

4   of paying a claim that's properly due and owing -- which

5   incidently, the Shaw contract contemplates was gonna remain

6   with the estate.  They talk about sales taxes in the Shaw

7   contract expressly, that's in our papers, Your Honor

8          THE COURT:  Yes

9          MR. SILVERSCHOTZ:  The reality here is just as was

10  dismissed with the wave of a hand in O'Brien, the failure to

11  receive a windfall doesn't constitute prejudice  And what

12  would happen here, Your Honor, is simply that the estate, if

13  the motion -- if my motion isn't granted, the estate would

14  be -- would get off from paying taxes that are properly owed

15  and that were timely filed because we didn't get the notice

16  that Your Honor told the Debtor to give us, and the tax returns

17  failed to properly reflect the income

18      To sum up, Your Honor, and I could --

19          THE COURT:  You don't need to

20          MR. SILVERSCHOTZ:  -- go around in a circle again

21          THE COURT:  You don't need to

22          MR SILVERSCHOTZ:  But there -- and I won't -- just to

23  make a closing point, not to repeat what I previously said --

24  in paragraph 29 of the Trustee's opposition to our motion, the

25  Trustee says (quote) "In short, the Board argues that the

B - 202

62

1  Debtors should have filled out a Proof of Claim form for the

2  Board " Your Honor, with deference in every direction to my

3  colleagues, I think what we actually argue is not that they

4  should have filed a Proof of Claim for us, but simply that they

5  should have given us the notice that we were entitled to and

6  filed tax returns that properly reflected the income that they

7  -- the sales income they received from the sale

8       THE COURT:  All right

9       MR. SILVERSCHOTZ:  Thank you

10      MR. CUNNINGHAM:  Your Honor, I have very brief

11 testimony from Mr. Soose and only two exhibits

12      THE COURT:  All right

13      MR. CUNNINGHAM:  Thank you, Your Honor    Trust calls

14 Mr  Soose

15      MR. SILVERSCHOTZ:  Your Honor, if counsel wants to

16 make a proffer, he may -- I --

17      MR  CUNNINGHAM:  It's -- it will be very quick, Your

18 Honor

19      THE COURT:  Well, tell me by proffer what it is

20      MR  CUNNINGHAM:  The proffer is -- is essentially the

21 filling out of tax returns subsequent to the sale, when that

22 was done, what it provided, and that it was filed and sent to

23 the State Department of Equalization that described the sale

24 that had taken place.  That was done prior to the setting of

25 the Administrative Bar Date Order by this Court and then we

61

1  served them the Administrative Bar Date Order  We served the

2  California Department of Board -- State Board of Equalization -

3  - they're on our affidavit of service  They received it. Your

4  Honor --

5       THE COURT:  Is that conceded?  You got the Bar Date

6  Order?

7       MR  SILVERSCHOTZ:  We got -- it is conceded that we --

8       THE COURT:  All right

9       MR  SILVERSCHOTZ:  -- received the Bar Date Order --

10      THE COURT:  So you don't need that?

11      MR  SILVERSCHOTZ:  -- Your Honor

12      MR. CUNNINGHAM:  Okay

13      THE COURT:  What about the tax returns?

14      MR  SILVERSCHOTZ:  Your Honor, we did the next --

15  there are confidentiality provisions in California law to which

16  --

17      THE COURT:  Well, let me hear the testimony.

18      MR  SILVERSCHOTZ:  That's fine, Your Honor

19      MR  CUNNINGHAM:  Thank you  Your Honor  The Trust

20  calls Mr  Soose

21      THE COURT:  You're already under oath  You need not

22  be sworn again.

23      SOOSE, LITIGATION TRUST WITNESS, PREVIOUSLY SWORN

24      MR  CUNNINGHAM:  Your Honor, I would like to identify

25  Debtor's Exhibit-1.  It's an Affidavit of Service with respect

*Weller's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B - 204

Soose - Direct                                      64

1  to the Sale Order.

2          THE COURT:  Well --

3          MR  CUNNINGHAM:  I can --

4          THE COURT:  Are you identifying -- or just have him --

5          MR  CUNNINGHAM:  Okay

6                  DIRECT EXAMINATION

7  BY MR  CUNNINGHAM:

8  Q.  Mr  Soose, Debtor's Exhibit-1 -- I mean --

9          THE COURT:  The Trust's.

10 BY MR. CUNNINGHAM:

11 Q.  -- the Trust's Exhibit-1, can you identify this?

12 A.  This is an Affidavit of Service signed by Kate Logan   It's

13 dated December 2nd, 2003.

14     (Litigation Trust's Exhibit-1 marked for identification)

15 Q.  And it --

16 A.  And it goes onto say that on or about November 26, 2003

17 copies of the notices were served and --

18          THE COURT:  The bar date

19 A.  -- then there's a service list

20          THE COURT:  All right

21 BY MR. CUNNINGHAM:

22 Q.  Mr. Soose, if you look at page 13 of bar date --

23 Administrative Bar Date Order

24 A.  Yes.

25 Q.  Do you see in the middle of second column the reference to

1  California State Board of Equalization?

2  A    Yes

3         MR. CUNNINGHAM:  Thank you. Your Honor.  I only have

4  one other Affidavit of Service and it relates to the Sale

5  Order

6         THE COURT:  All right

7         MR. CUNNINGHAM:  May I approach the witness. Your

8  Honor.

9         THE COURT:  Yes. you may

10        MR. CUNNINGHAM:  Thank you.

11    (Pause in proceedings)

12        MR. CUNNINGHAM:  Your Honor. I only have one copy with

13  me.  Let's -- I can explain to the Court what it is simply.

14        THE COURT:  What's the docket number?

15        MR. CUNNINGHAM:  It's -- the docket number -- this one

16  doesn't even have the docket number on it.  This is the

17  Declaration of Service by the Debtors.  It concerns the Sale

18  Order

19    (Litigation Trust's Exhibit-7 marked for identification)

20        THE COURT:  When was it filed?

21        MR. CUNNINGHAM:  The Affidavit of Service is dated

22  April 29th, 2002. Your Honor.

23        MR. SILVERSCHOTZ:  Your Honor. it might be document

24  #1369. which would be Exhibit-P to Mr. Parson's affidavit --

25  or his declaration, rather.

1    MR. CUNNINGHAM: And in it I simply note to the Court

2 with respect to that document --

3    THE COURT: I did not get Mr Parson's declaration

4 Are you seeking to have me consider that as evidence?

5    MR. SILVERSCHOTZ: Your Honor. I think the -- I'm very

6 sorry to hear that Your Honor doesn't have (indiscern.).

7    THE COURT: Any objection to my considering that?

8    MR CUNNINGHAM: I think it's hearsay. Your Honor

9    MR SILVERSCHOTZ: Your Honor, based on the response

10 that we received to our motion, it appeared that no facts were

11 in dispute. If --

12    THE COURT: Well, maybe they are   I'll hold off   Let

13 me hear the Debtor's evidence and then I'll consider whether or

14 not you can present any evidence

15    MR CUNNINGHAM: And Your Honor, simply with that

16 Affidavit of Service I was noting that on page 19 of that,

17 which was attached to their submission, there is service

18 recognized that it went to the California Attorney General's

19 Office in connection with the original Sale Order

20    THE COURT: Are you moving that as an exhibit?

21    MR. CUNNINGHAM: Yes. I am, Your Honor.

22    THE COURT: All right   We'll make copies at the

23 break

24    MR CUNNINGHAM: Okay.  Thank you.

25 BY MR. CUNNINGHAM:

Soope - Direct                          67

1  Q.  Mr. Soope, when did the sale to Shaw of substantially all
2  the assets in these cases take place?
3  A   It was effective May 3rd, 2002
4  Q   Did you complete a tax return for the State of California
5  during -- subsequent to the sale?
6  A.  Yes
7  Q.  Did you make reference at all to the sale, the Shaw sale
8  as we call it?
9  A.  Yes   The -- it was a part of the tax compliance work for
10 all of the Debtor companies, there were hundreds of tax
11 returns filed in jurisdictions throughout the United States,
12 including the State of California that for the calendar year
13 2002, those returns were filed which would be normally -- what
14 I'm referring to in this context is the income in franchise tax
15 returns
16 Q.  When did you file those returns with California?
17 A   They were filed in the Fall of 2003   The deadline would
18 have either been September 15th or October 15th   I don't recall
19 exactly, of the year after the sale
20 Q   And do you know when the bar date was fixed for the filing
21 of administrative claims in those cases?
22 A   The bar date was January 15th, 2004.
23 Q   Thank you, Your Honor   That is all the questions I had for
24 this witness
25        THE COURT:  Cross?

Witter's Cramp, Inc.
Certified Court Transcriber
732-529-7191

Soose - Direct                                              68

1         MR SILVERSCHOTZ: On those points, no, Your Honor   I

2    would --

3         THE COURT:  Thank you   You may step down

4         MR. SOOSE:  Thank you.

5         THE COURT:  Leave the exhibits there.

6      (The witness steps down)

7         MR SILVERSCHOTZ:  Your Honor, one point that I would

8    -- I would note and counsel -- to the extent counsel is

9    suggesting that service on the Attorney General constitutes

10   service on the Board of Equalization, that's contrary to the

11   holding of the District Court in the GST case   In fact  GST

12   stands for the proposition that merely mailing to the Board of

13   Equalization without specifying the routing code that's -- is

14   filed with the Middle District of -- central -- I believe it's

15   the Middle District of California -- is itself inadequate   But

16   here I don't think the Debtor is suggesting that it was --

17   anything was mailed in terms of the sale to Equalization merely

18   --

19        THE COURT:  Well, I don't have it

20        MR SILVERSCHOTZ  -- to --

21        THE COURT:  It's the one exhibit I don't have a copy

22   of it.  Do you want to give me it -- give it to me?

23        MR SILVERSCHOTZ:  Also, Your Honor, for what it's

24   worth --

25        THE COURT:  Please --

Walter's Cramp, Inc.
Certified Court Transcribers
735-519-0191

B - 209

69

1    MR. SILVERSCHOTZ:  I'm sorry.

2         THE COURT:  -- let me deal with one issue at a time

3    MR. CUNNINGHAM:  Your Honor. may I approach?

4         THE COURT:  Yes.  This is T-2?

5    MR. CUNNINGHAM:  Yes

6         THE COURT:  What page?

7    MR. CUNNINGHAM:  It's on page 19.

8         THE COURT:  All right.  You served California Attorney

9    General's Office?

10        MR. CUNNINGHAM:  Yes. Your Honor.

11        THE COURT:  All right  Well. what about the argument

12   you had to serve the California Board of Equalization

13   specifically?

14        MR  CUNNINGHAM:  The view, Your Honor. is we did not

15   believe we had any transfer taxes and therefore --

16        THE COURT:  So what?

17        MR  CUNNINGHAM:  -- didn't -- didn't serve it on them

18   individually  We did serve them with a notice of the

19   administrative bar date

20        THE COURT:  Okay.  They now say they have a claim

21   You're saying, "We served them with notice of the Sale Order "

22   So therefore. they have -- they were on notice  How does that

23   make them on notice to file their claim?

24        MR. CUNNINGHAM:  Well. we filed. as Mr. Soose said.

25   filed a tax return that indicated the sale and then --

1    THE COURT:  Well, where is the tax return and how did
2    it indicate the sale?  And was it filed with the California
3    Board of Equalization?
4           MR. CUNNINGHAM:  No, Your Honor, it was filed with the
5    State
6           THE COURT:  It was an income tax
7           MR. CUNNINGHAM:  It was filed with the State    Because
8    the view is that the Debtors did not believe that there was
9    a --
10          THE COURT:  Okay.  But --
11          MR  CUNNINGHAM:  -- transfer tax, so therefore --
12          THE COURT:  The issue is whether or not they got
13   notice to file a claim.
14          MR. CUNNINGHAM:  There is -- and there's no dispute
15   that they got notice of the Administrative Bar Date Order
16          THE COURT:  Okay
17          MR  CUNNINGHAM:  There's no dispute to that    That's
18   the main reason we're here    They got notice with respect to
19   that
20          THE COURT:  But they didn't get the notice of the
21   sale.
22          MR  CUNNINGHAM:  The State Attorney General's Office
23   got notice of the sale    The State -- California Board of
24   Equalization -- we have not found an affidavit of service that
25   indicates that they got notice of the sale, and they're

71

1    indicating that they didn't -- they didn't get that notice.

2            THE COURT:  So how did the administrative bar date --

3    how did they get notice that they had a claim?

4            MR. CUNNINGHAM:  I guess, Your Honor, we're back to

5    the Supreme Court view of whether you're a known Creditor or

6    not.  I mean, there was -- the -- they were not a known

7    Creditor at the time of the sale

8            THE COURT:  Why?

9            MR CUNNINGHAM:  But we did give them --

10           THE COURT:  Why?  Because you took the legal position

11   that they had no claim?

12           MR. CUNNINGHAM:  Again, Your Honor, I'm going back to

13   -- I don't -- we weren't in charge of who the Debtor sent

14   notice.

15           THE COURT:  I understand

16           MR CUNNINGHAM·  So we're going back and looking at

17   the record  We look at the record that the State Attorney

18   General's Office got it, not the -- the State Board of

19   Equalization  We do note that they did receive copy of the

20   Administrative Bar Date Order  They did have time to come

21   forward to assert whatever claim that they had and they didn't.

22   They have filed it after the effective date of the Plan

23           THE COURT:  That's all irrelevant.  That is true in

24   every single case where somebody asks to file a late claim.

25   They didn't file a claim.  Sometimes they actually got notice

Writer's Cramp, Inc.
Certified Court Transcribers
753 359-0191

B - 212

72

1   of the claim. How is the estate prejudiced by allowing a late

2   claim here?

3          MR. CUNNINGHAM: I think the estate is prejudiced in

4   that it is for $850,000. They're asserting it as an

5   administrative claim --

6          THE COURT: Okay.

7          MR. CUNNINGHAM: -- that was not factored in as part

8   of the Plan. And a confirmation Plan and the negotiations that

9   went into it. The whole purpose of the administrative --

10         THE COURT: Do you think that -- are you suggesting

11  that an $800,000 administrative claim would have meant that I

12  wouldn't confirm the Plan and they -- you would not have

13  proceeded with confirmation of this Plan?

14         MR. CUNNINGHAM: I'm not stating that. Your Honor.

15  I'm stating the purpose of the administrative --

16         THE COURT: How many millions of dollars in

17  administrative claims have been filed in this case?

18         MR. CUNNINGHAM: I would say several millions of

19  dollars.

20         THE COURT: I think over 25 million in administrative

21  claims if I'm remembering the Motion to Extend the Time to

22  object to administrative claims.

23         MR. CUNNINGHAM: There were a large amount of

24  administrative claims filed, Your Honor, and that was the

25  purpose of the administrative bar date.

Writer's Cramp, Inc.
Certified Court Reporters
732-329-0191

23

1    THE COURT: Okay  But didn't O'Brien say you can't

2  say it's prejudice just because I may allow the claim?  There

3  has to be some other prejudice like there's been -- already

4  been the final distribution to creditors and we can't get that

5  money back to re-distribute.  Isn't that the type of prejudice

6  that O'Brien and Pioneer are talking about to the estate?

7    MR CUNNINGHAM:  Your Honor, at -- Pioneer certainly

8  says that this Court is to take a look at the equitable

9  determinations and it's really up to Your Honor.  Our view, you

10  know, as counsel to the Trust, is that they did receive notice

11  of the administrative bar date   They could have come in and

12  they could have asserted the claim   They asserted it after the

13  effective date of the Plan.  So we were hit with a claim that

14  took place by a party who acknowledges they got the

15  administrative bar date notice but did not file the claim.  So

16  it is our view that we would be prejudiced in that this could

17  be the first of others that might try this.  And I know it's

18  case by case --

19    THE COURT:  It's case by case

20    MR  CUNNINGHAM:  It's case by case and it's an

21  equitable determination by this Court

22    (Pause in proceedings)

23    THE COURT:  Well, I won't ask you about the

24  substance of the objection   But I think that I will grant

25  the Motion to File a Late Administrative Claim.  I think that

74

1  there is not the type of prejudice to the estate that O'Brien
2  said needs be found  Clearly there would be prejudice to the
3  claimant because they would lose the right to collect on their
4  administrative claim to the extent they have one  Although
5  they did get notice of the administrative bar date. I agree
6  they didn't have notice that they may have a claim against the
7  estate because they did not get any notice of the sale or the
8  Sale Order. which gave rise or purports to give rise to their
9  claim  So I will grant the motion.

10        MR  SILVERSCHOTZ:  Your Honor. I'll settle an order
11  on counsel  I didn't bring an order with me.

12        THE COURT:  Okay

13        MR  SILVERSCHOTZ:  And I apologize to the Court about
14  the -- Mr  Parson's declaration  It is on the agenda so --

15        THE COURT:  It is?

16        MR. SILVERSCHOTZ:  Yes

17        THE COURT:  I'm sorry  it was filed with respect to
18  the objection to claim

19        MR  SILVERSCHOTZ:  Yes

20        THE COURT:  I did see that. sorry  All right  I
21  guess --

22        MR  CUNNINGHAM:  Your Honor. I think that's all the
23  matters we had this morning  I appreciate the Court's time

24        THE COURT:  All right.

25        MR. CUNNINGHAM:  Thank you.

75



MR. SILVERSCHOTZ:    Thank you, Your Honor

THE COURT:    We'll stand adjourned

(Court adjourned)

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    12-22-04
Signature of Transcriber                        Date

*Writer's Cramp, Inc*
*Certified Court Transcribers*
732-329-0191

B - 216

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 11 |
| THE IT GROUP, INC., *et al.* | Case No. 02-10118 (MFW) |
| Debtors. | (Jointly Administered) |

FIRST AMENDED JOINT CHAPTER 11 PLAN
FOR THE IT GROUP, INC. AND ITS AFFILIATED DEBTORS
PROPOSED BY THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

Dated: February 9, 2004

SKADDEN, ARPS, SLATE
MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, DE 19899-0636
(302) 651-3000

ATTORNEYS FOR THE DEBTORS

WHITE & CASE LLP
Wachovia Financial Center
200 South Biscayne Blvd. - Suite 4900
Miami, FL 33131
(305) 371-2700

THE BAYARD FIRM
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899
(302) 655-5000

ATTORNEYS FOR THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS

MIAMI 471311 (2K)

## Table of Contents

Page

ARTICLE I. DEFINITIONS AND INTERPRETATION ........................................................... 1
    1.1    Definitions............................................................................................................ 1
    1.2    Interpretation....................................................................................................... 10
    1.3    Application of Definitions and Rules of Construction Contained in the Bankruptcy Code ....... 10
    1.4    Other Terms........................................................................................................ 10
    1.5    Appendices and Plan Documents....................................................................... 10

ARTICLE II. CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS ................................ 11
    2.1    Claims and Equity Interests Classified................................................................ 11
    2.2    Administrative Claims and Tax Claims................................................................ 11
    2.3    Claims and Equity Interests............................................................................... 11
    2.4    Consolidated Plan............................................................................................... 11
    2.5    Separate Classification of Secured Claims......................................................... 11

ARTICLE III. IDENTIFICATION OF IMPAIRED CLASSES OF CLAIMS AND EQUITY INTERESTS ...... 12
    3.1    Unimpaired Classes of Claims and Equity Interests........................................... 12
    3.2    Impaired Classes of Claims and Equity Interests............................................... 12
    3.3    Impairment Controversies................................................................................... 12

ARTICLE IV. PROVISIONS FOR TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE
PLAN ............................................................................................................................ 12
    4.1    Treatment of Claims and Equity Interests........................................................... 12
    4.2    Litigation Trust Alternative.................................................................................. 14

ARTICLE V. PROVISIONS FOR TREATMENT OF UNCLASSIFIED CLAIMS UNDER THE PLAN .......... 14
    5.1    Treatment of Administrative Claims..................................................................... 14
    5.2    Treatment of Tax Claims.................................................................................... 15

ARTICLE VI. ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE
CLASSES OF CLAIMS OR EQUITY INTERESTS ................................................................ 15
    6.1    Classes Entitled to Vote..................................................................................... 15
    6.2    Class Acceptance Requirement.......................................................................... 15
    6.3    Confirmation Without Acceptance by All Impaired Classes................................. 16

ARTICLE VII. MEANS FOR IMPLEMENTATION OF THE PLAN ......................................... 16
    7.1    Substantive Consolidation of Debtors................................................................. 16
    7.2    IT Group Subsidiary Guarantees........................................................................ 16
    7.3    Merger and Dissolution of IT Group Corporate Entities....................................... 16
    7.4    The Plan Settlement........................................................................................... 16
    7.5    Shaw Stock......................................................................................................... 17
    7.6    Formation of Reorganized IT Group.................................................................... 17
    7.7    Oversight Committee.......................................................................................... 17
    7.8    Plan Administrator.............................................................................................. 19
    7.9    Chief Litigation Officer........................................................................................ 20
    7.10    Trusts................................................................................................................ 21
    7.11    Vesting of Assets of Debtors.............................................................................. 27
    7.12    Reconstitution of Board of Directors.................................................................... 27
    7.13    The New Charter and the New By-Laws............................................................. 27
    7.14    Cancellation of Instruments and Agreements..................................................... 27
    7.15    Expenses Incurred and Claims of the Indenture Trustee.................................... 27
    7.16    Causes of Action............................................................................................... 28
    7.17    Approval of the Plan Settlement.......................................................................... 28
    7.18    Employee Matters.............................................................................................. 28
    7.19    Special Provisions Regarding Insured Claims..................................................... 28

i

1GALE 431319 C1C)

Table of Contents
(continued)

Page

7.20    Appointment of the Disbursing Agent. ............................................................... 29
7.21    Sources of Cash for Plan Distributions. ............................................................. 29
7.22    Sources of Cash for Implementation of Plan. ..................................................... 29
7.23    Investment of Funds Held by the Disbursing Agent; Tax Reporting by the Disbursing
        Agent...................................................................................................... 29
7.24    Distributions under the Plan. ........................................................................... 29
7.25    Timing of Distributions under the Plan. ............................................................. 29
7.26    Address for Delivery of Distributions under the Plan. ........................................... 30
7.27    Time Bar to Cash Payments. ........................................................................... 30
7.28    Manner of Payment under the Plan. .................................................................. 30
7.29    Expenses Incurred on or after the Effective Date and Claims of the Disbursing Agent. ... 30
7.30    Fractional Distributions. ................................................................................. 30
7.31    Corporate Action. .......................................................................................... 30
7.32    Effectuating Documents and Further Transactions. ............................................... 31

ARTICLE VIII.  PROCEDURES FOR RESOLVING AND TREATING CONTESTED CLAIMS .......... 31
8.1     Objection Deadline. ....................................................................................... 31
8.2     Prosecution of Contested Claims. ..................................................................... 31
8.3     Claims Settlement Guidelines. ......................................................................... 31
8.4     No Distributions Pending Allowance. ................................................................. 31
8.5     Distributions After Allowance. ......................................................................... 32
8.6     Estimation of Claims. ..................................................................................... 32

ARTICLE IX.  CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE OCCURRENCE
OF THE EFFECTIVE DATE. ......................................................................................... 32
9.1     Conditions Precedent to Confirmation. ............................................................... 32
9.2     Conditions Precedent to the Occurrence of the Effective Date. ............................... 33
9.3     Waiver of Conditions. ..................................................................................... 33
9.4     Effect of Failure of Conditions to Effective Date .................................................. 33

ARTICLE X.  THE DISBURSING AGENT ........................................................................ 33
10.1    Powers and Duties. ........................................................................................ 33
10.2    Distributions. ............................................................................................... 33
10.3    Exculpation. ................................................................................................. 33

ARTICLE XI.  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........... 34
11.1    Assumption of Executory Contracts and Unexpired Leases. ................................... 34
11.2    Rejection of Executory Contracts and Unexpired Leases. ...................................... 34
11.3    Claims Arising from Rejection or Termination. ................................................... 35

ARTICLE XII.  RETENTION OF JURISDICTION .............................................................. 35

ARTICLE XIII.  MISCELLANEOUS PROVISIONS .............................................................. 36
13.1    Payment of Statutory Fees. ............................................................................. 36
13.2    Discharge of the Debtors. ............................................................................... 36
13.3    Third Party Agreements; Subordination. ........................................................... 37
13.4    Dissolution of Committee. .............................................................................. 37
13.5    Exculpation. ................................................................................................. 37
13.6    Title to Assets; Discharge of Liabilities. ............................................................ 37
13.7    Surrender and Cancellation of Instruments. ....................................................... 38
13.8    Notices. ...................................................................................................... 38
13.9    Headings. .................................................................................................... 39
13.10   Governing Law. ............................................................................................ 40
13.11   Expedited Determination. ............................................................................... 40

i

16636 471573 (XX)

Table of Contents
(continued)

Page

13.12   Exemption from Transfer Taxes .................................................................... 40
13.13   Notice of Entry of Confirmation Order and Relevant Dates ............................ 40
13.14   No Interest or Attorneys' Fees .................................................................... 40
13.15   Modification of the Plan ............................................................................ 40
13.16   Revocation of Plan .................................................................................... 40
13.17   Setoff Rights ............................................................................................ 41
13.18   Compliance with Tax Requirements ............................................................ 41
13.19   Injunctions ............................................................................................... 41
13.20   Term of Injunctions or Stays ...................................................................... 41
13.21   Injunction Against Interference With Chapter 11 Plan .................................. 41
13.22   Officers and Directors .............................................................................. 42
13.23   Binding Effect ........................................................................................... 42
13.24   Severability ............................................................................................... 43

The IT Group, Inc. and its affiliated debtors and debtors-in-possession in the above-captioned jointly administered chapter 11 cases and the Official Committee of Unsecured Creditors hereby collectively and jointly propose the following first amended joint chapter 11 plan:

## ARTICLE I.
## DEFINITIONS AND INTERPRETATION

1.1   **Definitions**

The capitalized terms used herein shall have the respective meanings set forth below:

(a)   "Administrative Bar Date Order" means the Final Order dated November 24, 2003 fixing January 15, 2004 as the last day to file certain administrative expense claims against the Debtors that arose, accrued, or otherwise became due and payable on and between January 16, 2002 and November 15, 2003 in the Chapter 11 Cases.

(b)   "Administrative Claim" means (i) a Claim incurred by a Debtor (or its Estate) on or after the Petition Date and before the Effective Date for a cost or expense of administration in the Chapter 11 Cases entitled to priority under sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, Cure Claims, Fee Claims and Statutory Fees, if any, (ii) reasonable pre-Committee fees and expenses of White & Case LLP up to $53,000 and The Bayard Firm up to $11,000 as counsel to the ad hoc committee of holders of the Old 11¼% Notes in connection with these Chapter 11 Cases, (iii) reasonable fees and expenses of Raymond Pompe and Charles Brewer up to $60,000 in the aggregate as consultants to the Committee, and (iv) reasonable fees and expenses of counsel to the Agent incurred through the Effective Date.

(c)   "Administrative Reserve" means $1,500,000 of the Cash on hand in the Estates as of the Effective Date to fund all reasonable costs and expenses incurred after the Effective Date associated with implementation and administration of the Plan, including, without limitation, prosecution of Causes of Action of the Debtors and, if applicable, the administrative costs of the Litigation Trust.

(d)   "Administrative Surcharge" means the surcharge, if any, of the Litigation Recoveries to the extent necessary to fund implementation and administration of the Plan after the Effective Date (including, if applicable, the Litigation Trust) in excess of the Administrative Reserve in accordance with Section 7.22 of the Plan.

(e)   "Affiliate" means, with respect to any Person, all Persons that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code, if such Person were a debtor in a case under the Bankruptcy Code.

(f)   "Agent" means Citicorp USA, Inc. in its capacity as administrative agent for the Prepetition Lenders under the Prepetition Credit Facility.

(g)   "Allowed" when used

(i)   with respect to any Claim, except for a Claim that is an Administrative Claim, means such Claim (A) to the extent it is not a Contested Claim; (B) to the extent it is allowed pursuant to any stipulation or agreement that has been approved by Final Order; (C) to the extent it is a Contested Claim, proof of which was filed timely with the Bankruptcy Court, and (I) as to which the Objection Deadline passed and no objection has been filed, unless the Bankruptcy Court determines that such Claim is to be determined in a forum other than the Bankruptcy Court, in which case such Claim shall not become Allowed until determined by Final Order of such other forum and allowed by Final Order of the Bankruptcy Court; or (II) as to which an objection was filed by the Objection Deadline, to the extent allowed by a Final Order; or (D) which otherwise becomes an Allowed Claim as provided in the Plan; provided, however, that a Claim which is not listed in the Schedules and which is not the subject of a proof of claim filed timely with the Bankruptcy Court shall not be an Allowed Claim except as otherwise expressly ordered by the Bankruptcy Court; and

(ii)    with respect to an Administrative Claim, means an Administrative Claim that has become "Allowed" pursuant to the procedures set forth in Section 5.1(c) of the Plan.

(h)    "Assets" means all of the Debtors' right, title and interest of any nature in property, wherever located, as specified in section 541 of the Bankruptcy Code.

(i)    "Available Proceeds" means, at any time, the amount of Cash on hand in the Estates, Reorganized IT Group and, if applicable, the Litigation Trust, on and after the Effective Date, including, without limitation, any recovery from the Severson request for equitable adjustment to the U.S. Army Corps of Engineers, excluding (i) the Administrative Reserve (but only to the extent used to fund all reasonable costs and expenses incurred after the Effective Date associated with implementation and administration of the Plan), (ii) the Administrative Surcharge, if any, (iii) the IT Environmental Liquidating Trust Funding, (iv) the Environmental Liquidating Trust Assets, (v) Litigation Recoveries, (vi) the monies maintained in a segregated interest-bearing account on behalf of Rochelle Bookspan (approximately $500,000) pursuant to the Final Order of the Bankruptcy Court approving the Shaw Sale, but only so long as an order of the Bankruptcy Court or other court of competent jurisdiction requires that the monies in such account be segregated for the benefit of Ms. Bookspan, it being understood that thereafter such monies shall constitute Available Proceeds, and (vii) an amount sufficient to pay in Cash in full all Allowed Non-Lender Secured Claims, Allowed Administrative Claims, Allowed Tax Claims and Allowed Priority Claims.

(j)    "Avoidance Actions" means all Causes of Action of the Debtors and/or their Estates that arise under chapter 5 of the Bankruptcy Code.

(k)    "Avoidance Action Recoveries" means, at any time, the amount of Cash or other consideration obtained by or paid to the Estates, Reorganized IT Group and, if applicable, the Litigation Trust, associated with any judgment, settlement or other disposition of Avoidance Actions, less (i) reimbursement to the Estates from the first proceeds of the Avoidance Action Recoveries of the filing fees associated with such Avoidance Actions, which monies shall constitute and be distributed as Available Proceeds, and (ii) the Administrative Surcharge, if any.

(l)    "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended and codified at title 11 of the United States Code and as applicable to the Chapter 11 Cases.

(m)    "Bankruptcy Court" means the Bankruptcy Court unit of the United States District Court for the District of Delaware, or such other court having jurisdiction over the Chapter 11 Cases.

(n)    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as prescribed by the United States Supreme Court pursuant to section 2075 of title 28 of the United States Code and as applicable to the Chapter 11 Cases.

(o)    "Bar Date Order" means the Final Order dated May 24, 2002 fixing July 15, 2002 as the last day to file proofs of claim against the Debtors in the Chapter 11 Cases.

(p)    "Business Day" means any day on which commercial banks are open for business in New York, New York.

(q)    "Cash" means legal tender of the United States of America or readily marketable direct obligations of, or obligations guaranteed by, the United States of America.

(r)    "Cash Collateral Orders" means, collectively, the orders of the Bankruptcy Court in the Chapter 11 Cases authorizing and approving the Debtors' use of cash collateral under the Prepetition Credit Facility.

(s)    "Causes of Action" means all claims, rights, actions, causes of action, including Avoidance Actions, liabilities, obligations, suits, debts, remedies, dues, sums of money, accounts, reckonings,

B    222

bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages or judgments, whether known or unknown and whether asserted or unasserted.

(t) "Chapter 11 Cases" means the cases under chapter 11 of the Bankruptcy Code pending before the Bankruptcy Court with respect to each of the Debtors.

(u) "Chief Litigation Officer" means AlixPartners LLC or such other Person identified at or prior to the Confirmation Hearing and selected by the Committee (in consultation with the Agent).

(v) "Claim" means (i) any right to payment from a Debtor, whether or not such right is known or unknown, reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; (ii) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from a Debtor, whether or not such right to an equitable remedy is known or unknown, reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured; or (iii) any right under section 502(h) of the Bankruptcy Code.

(w) "Committee" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases by the Office of the United States Trustee in accordance with section 1102(a) of the Bankruptcy Code.

(x) "Committee Designees" means two individuals selected by the Committee to serve as members of the Oversight Committee from and after the Effective Date.

(y) "Committee Lawsuit" means the adversary proceeding pending before the Bankruptcy Court in the Chapter 11 Cases, which was commenced by the Committee against certain of the Prepetition Lenders and styled Official Committee of Unsecured Creditors v. Citicorp USA, Inc., Adv. No. 02-04761 (MFW), as it may be amended from time to time.

(z) "Confirmation Date" means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

(aa) "Confirmation Hearing" means the hearing held by the Bankruptcy Court, as it may be continued from time to time, on confirmation of the Plan.

(bb) "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan.

(cc) "Consent Order" means that certain consent order between IT Corporation and the State of California in California v. International Technology Corp., No. 509105 (Super. Ct., June 27, 1989), as amended by stipulation, Sept. 30, 1999, pursuant to which the Debtors consent to certain terms under the California Hazardous Waste Control Act, which require, inter alia, closure and post-closure care of the Landfills as well as financial assurance with respect to those obligations.

(dd) "Contested Claim" means a Claim (i) to the extent it is listed in the Schedules as disputed, contingent, or unliquidated, in whole or in part; (ii) that is listed in the Schedules as undisputed, liquidated, and not contingent and as to which a proof of claim has been filed with the Bankruptcy Court, to the extent the proof of claim amount exceeds the scheduled amount; (iii) that is not listed in the Schedules, but as to which a proof of claim has been filed with the Bankruptcy Court; or (iv) as to which an objection has been filed on or before the Objection Deadline; provided, that a Claim that is Allowed by Final Order or pursuant to the Plan on or before the Effective Date shall not be a Contested Claim.

(ee) "Contested Unsecured Claim" means an Unsecured Claim that is a Contested Claim.

(ff) "Contested Unsecured Claims Reserve" means any Distribution retained on account of a Contested Unsecured Claim.

B 223

(gg)    "Cure Claims" means all amounts required to be paid by any Debtor pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code as a consequence of the assumption pursuant to Article XI of the Plan of any executory contract or unexpired lease of any Debtor, excluding any amounts to be paid by Shaw in accordance with the Shaw Sale.

(hh)    "Debtors" means, collectively, the IT Group and each of its affiliates listed on Exhibit E to the Disclosure Statement, each in its respective capacity as a debtor and a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code in the Chapter 11 Cases.

(ii)    "Disallowed" when used with respect to a Claim, means a Claim, or such portion of a Claim, that has been disallowed by a Final Order.

(jj)    "Disbursing Agent" means Reorganized IT Group, the Litigation Trust Trustee or such other Person identified at or prior to the Confirmation Hearing and selected by the Committee and the Agent, in which capacity, it shall (i) make the Distributions contemplated under the Plan, the Confirmation Order, or any other relevant Final Order; (ii) perform any other act or task that is or may be delegated to the Disbursing Agent under the Plan; and (iii) perform any other act or task necessary or appropriate to implement and administer the Plan on behalf of the Estates.

(kk)    "Disclosure Statement" means the disclosure statement with respect to the Plan, as approved by the Bankruptcy Court as containing adequate information in accordance with section 1125 of the Bankruptcy Code, all exhibits and annexes thereto and any amendments or modifications thereof.

(ll)    "Distribution" means the payment or distribution under the Plan of property or interests in property to any holder of an Allowed Claim. Unless otherwise agreed by the holder of an Allowed Claim, any payment in Cash to be made by the Disbursing Agent shall be made, at the election of the Disbursing Agent, by check drawn on a domestic bank or by wire transfer from a domestic bank.

(mm)    "Distribution Date" means, with respect to any Claim, (i) the Effective Date, if such Claim is then an Allowed Claim, (ii) the first Business Day occurring three (3) full months after the immediately preceding Distribution Date after the date such Claim becomes Allowed, if not Allowed on the Effective Date and (iii) such other dates that the Oversight Committee determines in its reasonable discretion that Distribution to the holders of Allowed Claims should be made in accordance with the Plan.

(nn)    "DTSC" means the California Department of Toxic Substances Control.

(oo)    "Effective Date" means the date selected by the Plan Proponents (in consultation with the Agent) which is no later than thirty (30) days after all of the conditions specified in Section 9.2 of the Plan have been satisfied or waived.

(pp)    "Environmental Unsecured Claim" means an Unsecured Claim against any Debtor arising under, related to or in connection with alleged contamination under the federal or state environmental laws or regulations.

(qq)    "Equity Interest" means any ownership or equity interest in any of the Debtors, including, without limitation, interests evidenced by common or preferred stock, warrants, options, limited liability company membership interests or other rights to purchase any ownership or equity interest in any of the Debtors.

(rr)    "Estate" means the estate of any Debtor created by section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

(ss)    "Estate Causes of Action" means Causes of Action of the Debtors and/or their Estates (other than the Avoidance Actions).

B    224

(tt)    "Estate Cause of Action Recoveries" means, at any time, the amount of Cash or other consideration obtained by or paid to the Estates, Reorganized IT Group and, if applicable, the Litigation Trust, associated with any judgment, settlement or other disposition of Estate Causes of Action. [less the Administrative Surcharge, if any.

(uu)    "Estimated Claims Order" means any Final Order of the Bankruptcy Court estimating any Claim or the aggregate amount of all Claims in any class created under the Plan to aid in the confirmation of the Plan, or the calculation of Distributions under the Plan.

(vv)    "Fee Application" means an application for allowance and payment of a Fee Claim.

(ww)    "Fee Claim" means a Claim of a Professional Person under sections 330 or 503 of the Bankruptcy Code for final allowance of compensation for services rendered and reimbursement of expenses incurred in the Chapter 11 Cases from the Petition Date to the Effective Date.

(xx)    "Final Decree" means the final decree of the Bankruptcy Court entered in the Chapter 11 Cases pursuant to Bankruptcy Rule 3022.

(yy)    "Final Order" means (i) an order or judgment of the Bankruptcy Court or any other court or adjudicative body having jurisdiction over a proceeding or matter as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending; or (ii) in the event that an appeal, writ of certiorari, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court or any other court or adjudicative body shall have been affirmed by the highest court to which such order was appealed, or certiorari has been denied, or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, that no order shall fail to be a Final Order solely because of the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed with respect to such order

(zz)    "General Unsecured Claim" means an Unsecured Claim other than a Litigation Unsecured Claim, a Securities Litigation Claim and a Subordinated Claim.

(aaa)    "Indenture Trustee" means the Bank of New York, as indenture trustee under the Old Notes.

(bbb)    "Indemnified CLO Parties" means those parties identified in Section 7.9 of the Plan.

(ccc)    "Indemnified ELT Parties" means those parties identified in Section 7.10(H) of the Plan.

(ddd)    "Indemnified OC Parties" means those parties identified in Section 7.7 of the Plan.

(eee)    "Indemnified FA Parties" means those parties identified in Section 7.8 of the Plan.

(fff)    "Insurance Company" means any insurance company that provides any insurance, indemnification, reimbursement, contribution or other payment or similar coverage to any of the Debtors, Reorganized IT Group or, if applicable, the Litigation Trust, pursuant to an Insurance Policy.

(ggg)    "Insurance Policy" means the relevant policy of insurance issued by the applicable Insurance Company under which the Debtors, Reorganized IT Group, or, if applicable, the Litigation Trust, are insureds or beneficiaries of the coverage of any of the Debtors.

(hhh)    "Insured Claim" means any Claim against a Debtor for which the Debtor is entitled to indemnification, reimbursement, contribution or other payment under a policy of insurance wherein a Debtor is an insured or beneficiary of the coverage of any of the Debtors.

(ii)     "Internal Revenue Code" means the Internal Revenue Code of 1986, as amended, and any applicable rulings, regulations (including temporary and proposed regulations) promulgated thereunder, judicial decisions, and notices, announcements, and other releases of the United States Treasury Department or the IRS.

(jj)     "IRS" means the United States Internal Revenue Service.

(kkk)     "IT Environmental Liquidating Trust" means the trust to be established on the Effective Date pursuant to the Plan and the IT Environmental Liquidating Trust Agreement.

(lll)     "IT Environmental Liquidating Trust Agreement" means the trust agreement to be entered into pursuant to the Plan to be filed as a Plan Document, under which the powers, duties and responsibilities of the IT Environmental Liquidating Trust shall be set forth.

(mmm)     "IT Environmental Liquidating Trust Assets" means the Assets of the Debtors which shall be transferred to the IT Environmental Liquidating Trust in accordance with the IT Environmental Liquidating Trust Agreement and Section 7.10(II) of the Plan.

(nnn)     "IT Environmental Liquidating Trust Funding" means $1,000,000 of the Cash on hand in the Estates as of the Effective Date to be transferred to the IT Environmental Liquidating Trust in accordance with the IT Environmental Liquidating Trust Agreement and Section 7.10(II) of the Plan.

(ooo)     "IT Environmental Liquidating Trustee" means Brian Fournier or such other Person identified at or prior to the Confirmation Hearing and selected by the Committee and the Debtors, provided that the DTSC does not object.

(ppp)     "IT Group" means The IT Group, Inc., a Delaware corporation, as a debtor and debtor-in-possession in jointly administered Case No. 02-10118 (MFW).

(qqq)     "Landfills" means those certain four landfills in Northern California known as Montezuma Hills, Benson Ridge, Vine Hill Complex, and Panoche owned and maintained by the Debtors, IT Corporation, IT Lake Herman Road LLC and IT Vine Hill LLC. which are the subject of the Consent Order.

(rrr)     "Lender Claim" means a Claim of the Agent and the Prepetition Lenders under the Prepetition Credit Facility and Cash Collateral Orders.

(sss)     "Lender Designees" means two individuals selected by the Agent and/or the Prepetition Lenders to serve as members of the Oversight Committee from and after the Effective Date.

(ttt)     "Litigation Recoveries" means collectively, the Avoidance Action Recoveries and the Estate Cause of Action Recoveries.

(uuu)     "Litigation Trust" means the litigation trust described in Section 7.10(I) of the Plan, to be formed at the election of the Agent (on behalf of the Prepetition Lenders) and the Committee.

(vvv)     "Litigation Trust Agreement" means the agreement governing the Litigation Trust, dated as of the Effective Date, to be filed as a Plan Document.

(www)     "Litigation Trust Alternative" shall have the meaning ascribed to such term in Section 4.2 of the Plan.

(xxx)     "Litigation Trust Assets" means the Avoidance Actions, Estate Causes of Action, an amount of cash reasonably sufficient to administer the Litigation Trust and such other rights and/or assets as the Agent (on behalf of the Prepetition Lenders) and the Committee designate (including, without limitation, the Administrative Reserve, subject to the obligation of the Litigation Trust to utilize such reserve to satisfy the claims and expenses for which such reserve was established, and any assets the sale, disposition or collection of which,

after the Effective Date, would give rise to Available Proceeds), and the earnings and proceeds therefrom. Litigation Trust Assets shall not include any IT Environmental Liquidating Trust Assets.

(yyy)    "Litigation Trust Trustee" means the Plan Administrator and the Chief Litigation Officer, as co-trustees, each having substantially the same responsibilities vis-à-vis the Litigation Trust as they have, or would have had, vis-à-vis Reorganized IT Group. The designation of the Litigation Trust Trustee shall be effective on the Effective Date without the need for a further order of the Bankruptcy Court.

(zzz)    "Litigation Unsecured Claim" means (i) an Environmental Unsecured Claim; (ii) a Tort Unsecured Claim; and (iii) any other Unsecured Claim, except a Securities Litigation Claim and a Subordinated Claim, against any Debtor that was asserted in any court, tribunal or proceeding prior to the Petition Date.

(aaaa)    "LLCs" means IT Vine Hill LLC and the IT Lake Herman Road LLC which together own the real property containing two of the Landfills.

(bbbb)    "New By-Laws" means the by-laws of Reorganized IT Group, as amended and restated in accordance with Section 7.13 of the Plan. The New By-Laws shall be in substantially the form filed with the Bankruptcy Court as a Plan Document.

(cccc)    "New Charter" means the certificate of incorporation of Reorganized IT Group, as amended and restated in accordance with Section 7.13 of the Plan. The New Charter shall be in substantially the form filed with the Bankruptcy Court as a Plan Document.

(dddd)    "New Common Stock" means the share of common stock of Reorganized IT Group to be authorized for issuance pursuant to the Plan, which share (upon issuance) shall evidence a 100% common ownership interest in Reorganized IT Group.

(eeee)    "Non-Lender Secured Claim" means, excluding Lender Claims, (i) a Claim secured by a Lien on any Assets, which lien is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, and which is duly established in the Chapter 11 Cases, but only to the extent of the value of the holder's interest in the collateral that secures payment of the Claim; (ii) a Claim that is subject to a valid right of recoupment or setoff under section 553 of the Bankruptcy Code, but only to the extent of the Allowed amount subject to recoupment or setoff as provided in section 506(a) of the Bankruptcy Code; and (iii) a Claim allowed under the Plan as a Non-Lender Secured Claim.

(ffff)    "Northern District of California" means the United States District Court for the Northern District of California.

(gggg)    "Objection Deadline" means the deadline for filing objections to Claims as set forth in Section 8.1 of the Plan.

(hhhh)    "Old 11 ¼% Notes" means, collectively, the 11 ¼% Senior Subordinated Notes of the IT Group due 2009 in the aggregate principal amount of $225,000,000.

(iiii)    "Old 8% Notes" means, collectively, the 8% Subordinated Notes of the OHM Corporation due 2005 in the aggregate principal amount of $31,622,000.

(jjjj)    "Old Notes" means, collectively, the Old 11 ¼% Notes and the Old 8% Notes.

(kkkk)    "Oversight Committee" means the committee consisting of four members (which number may not be increased), two selected by the Committee and two selected by the Agent on behalf of the Prepetition Lenders, which shall oversee the administration and implementation of the Plan and the liquidation of the Debtors' Assets in accordance with the Plan.

B   227

(lllll)    "Oversight Committee Compensation" means the compensation disclosed at or prior to the Confirmation Hearing and agreed to by the Committee and the Agent to be paid to Oversight Committee members in accordance with Section 7.7 of the Plan.

(mmmm)    "Person" means an individual, corporation, partnership, limited liability company, joint venture, trust, estate, unincorporated association, unincorporated organization, governmental entity, or political subdivision thereof, or any other entity that would fall within the definition assigned to such term in section 101(41) of the Bankruptcy Code.

(nnnn)    "Petition Date" means the date on which the Chapter 11 Cases were commenced, January 16, 2002.

(oooo)    "Plan" means this chapter 11 plan, either in its present form or as it may be amended, supplemented, or otherwise modified from time to time, and the exhibits and schedules to the foregoing, as the same may be in effect at the time such reference becomes operative.

(pppp)    "Plan ADR" means the alternative dispute resolution procedures to be filed with the Bankruptcy Court as a Plan Document, pursuant to which all Litigation Unsecured Claims shall be liquidated, unless the holder of a Litigation Unsecured Claim has obtained or seeks and obtains relief from the automatic stay or from the ADR Injunction (as defined in the Plan ADR) to prosecute its claim in a non-bankruptcy forum and does not consent to participate in the Plan ADR.

(qqqq)    "Plan Administrator" means AlixPartners LLC or such other Person identified at or prior to the Confirmation Hearing and selected by the Committee and the Agent.

(rrrr)    "Plan Documents" means the documents that aid in effectuating the Plan as specifically identified as such herein and filed with the Bankruptcy Court as specified in Section 1.5 of the Plan.

(ssss)    "Plan Proponents" means, collectively, the Debtors and the Committee.

(tttt)    "Plan Settlement" means the compromise and settlement between the Agent, the Prepetition Lenders, the Debtors, the Subsidiaries that are not Debtors, and the Committee (and its respective members) as set forth in Section 7.4 of the Plan.

(uuuu)    "Post Closure Policies" means the Debtors' interest in AIG Post Closure Policy 4762403 and AIG Post Closure Excess Policy 4760892, and any other insurance policies belonging to the Debtors at any time which provide coverage for post-closure costs at the Landfills.

(vvvv)    "Post-Confirmation Interest" means simple interest at the rate of 1.0% per annum or such other rate as the Bankruptcy Court may determine at the Confirmation Hearing is appropriate. such interest to accrue from the Distribution Date with respect to any Allowed Tax Claim.

(wwww)    "Prepetition Credit Facility" means that certain Second Amended and Restated Credit Agreement dated as of March 7, 2000 between the Prepetition Lenders with Citicorp USA, Inc., as administrative agent and Fleet National Bank, N.A. as documentation agent and the institutions listed therein as co-agents, and certain of the Debtors. together with all documents, instruments, and agreements executed or entered into in connection therewith, and any amendments thereto.

(xxxx)    "Prepetition Lenders" means those lenders who are parties to the Prepetition Credit Facility.

(yyyy)    "Priority Claim" means any Claim to the extent such Claim is entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than the Lender Claims, Non-Lender Secured Claims, Administrative Claims, and Tax Claims.

B   22B

:

(zzzz)   "Professional Person" means a Person retained or to be compensated for services rendered or costs incurred on or after the Petition Date and on or prior to the Effective Date pursuant to sections 327. 328, 330, 503(b) or 1103 of the Bankruptcy Code in the Chapter 11 Cases.

(aaaaa)   "Pro Rata Share" means the proportion that the amount an Allowed Claim bears to the aggregate amount of all Claims in a particular class, including Contested Claims, but not including Disallowed Claims, (i) as calculated by the Disbursing Agent on or before any Distribution Date; or (ii) as determined by the Bankruptcy Court in an Estimated Claims Order. if such an order is sought and obtained.

(bbbbb)   "Reorganized IT Group" means, collectively. the Debtors as reorganized from and after the Effective Date pursuant to Article VII of the Plan

(ccccc)   "Schedules" means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors with the Bankruptcy Court, as required by section 521 of the Bankruptcy Code and the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009.

(ddddd)   "SEC" means the United States Securities and Exchange Commission.

(eeeee)   "Securities Litigation" means the following actions: (i) Civil Action No. 02-1927 pending in the United States District Court for the Western District of Pennsylvania, styled Thomas L. Payne, et al., v. Anthony J. DeLuca, et al.; (ii) Civil Action No. 03-0288 pending in the United States District Court for the Western District of Pennsylvania, styled Howard G. Clair, et al., v. Anthony J. DeLuca, et al.; and (iii) Civil Action No. 02-0886 pending in the District Court for the Western District of Pennsylvania, styled Siena Asset Management LLC v. Anthony J. DeLuca, et al.

(fffff)   "Securities Litigation Claims" means any claim or Cause of Action against the Debtors, their predecessors or successors arising from rescission of a purchase or sale of the Old Notes or Equity Interests of any Debtor, or for damages arising from the purchase or sale of the Old Notes or Equity Interests of any Debtor, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a claim.

(ggggg)   "Shaw" means The Shaw Group, Inc. or its designee.

(hhhhh)   "Shaw Sale" means the sale of substantially all of the Assets of the Debtors to Shaw approved by order of the Bankruptcy Court dated April 25, 2002.

(iiiii)   "Shaw Stock" means the common stock of Shaw received by the Debtors pursuant to the Shaw Sale.

(jjjjj)   "Soose Loans" means, collectively, the loans made pursuant to certain loan agreements between IT Group and Harry Soose. Jr., dated July 1999 and May 2000.

(kkkkk)   "Statutory Fees" means all fees payable by the Debtors pursuant to section 1930 of title 28 of the United States Code. that accrued prior to, on or after the Effective Date.

(lllll)   "Subordinated Claims" means any Claim subordinated pursuant to a Final Order under section 510(c) of the Bankruptcy Code.

(mmmmm)   "Subsidiary" means any entity of which IT Group owns directly or indirectly all of the outstanding capital stock or limited liability company membership interests.

(nnnnn)   "Tax Claim" means a Claim against any of the Debtors that is of a kind specified in section 507(a)(8) of the Bankruptcy Code.

B   229

(ooooo) "Tort Unsecured Claim" means an Unsecured Claim (other than an Environmental Unsecured Claim) against any Debtor for personal injury or property damage allegedly arising from the tortious actions or inactions of any of the Debtors, their agents or any other person.

(ppppp) "Unsecured Claim" means any Claim other than a Lender Claim, a Non-Lender Secured Claim, an Administrative Claim, a Priority Claim or a Tax Claim.

(qqqqq) "Voting Procedures Order" means the Final Order of the Bankruptcy Court approving procedures relating to the solicitation and tabulation of votes with respect to the Plan.

### 1.2    Interpretation

Unless otherwise specified, all section, article and exhibit references in the Plan are to the respective section in, article of, or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time. Words denoting the singular number shall include the plural number and vice versa, and words denoting one gender shall include the other gender. The Disclosure Statement may be referred to for purposes of interpretation to the extent any term or provision of the Plan is determined by the Bankruptcy Court to be ambiguous.

### 1.3    Application of Definitions and Rules of Construction Contained in the Bankruptcy Code

Words and terms defined in section 101 of the Bankruptcy Code shall have the same meaning when used in the Plan, unless a different definition is given in the Plan. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan.

### 1.4    Other Terms

The words "herein," "hereof," "hereto," "hereunder" and others of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan. A term used herein that is not defined herein shall have the meaning ascribed to that term, if any, in the Bankruptcy Code.

### 1.5    Appendices and Plan Documents

All appendices to the Plan and the Plan Documents are incorporated into the Plan by this reference and are a part of the Plan as if set forth in full herein. All Plan Documents shall be in a form reasonably acceptable to the Plan Proponents and the Agent. The Plan Documents (in substantially final form) shall be filed with the Clerk of the Bankruptcy Court not less than ten (10) days prior to the commencement of the Confirmation Hearing. Holders of Claims and Equity Interests may obtain a copy of the Plan Documents once filed, by a written request sent to the following address:

White & Case LLP<br>
200 South Biscayne Boulevard<br>
Miami, Florida 33131<br>
Attention: Mark D. Puhr<br>
Telephone: (305) 371-2700<br>
Facsimile: (305) 358-5744

## ARTICLE II.
## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

**2.1    Claims and Equity Interests Classified**

For purposes of organization, voting and all confirmation matters, except as otherwise provided herein, all Claims (except for Administrative Claims and Tax Claims) and all Equity Interests shall be classified as set forth in this Article II of the Plan.

**2.2    Administrative Claims and Tax Claims**

As provided in section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Tax Claims are not classified for purposes of voting or receiving distributions under the Plan. All such Claims shall be treated separately as unclassified Claims on the terms set forth in Article V of the Plan.

**2.3    Claims and Equity Interests**

The Plan classifies the Claims against and Equity Interests in each of the Debtors as follows:

(a)    Class 1:    Priority Claims

(b)    Class 2:    Non-Lender Secured Claims

(c)    Class 3:    Lender Claims

(d)    Class 4A:    General Unsecured Claims

(e)    Class 4B:    Litigation Unsecured Claims

(f)    Class 4C:    Securities Litigation Claims

(g)    Class 4D:    Subordinated Claims

(h)    Class 5:    Equity Interests

**2.4    Consolidated Plan**

Although the Plan has been filed as a joint Plan for all of the Debtors for purposes of administrative convenience and efficiency, the Plan provides for the substantive consolidation of the Debtors for all purposes under the Plan. Voting on the Plan, confirmation of the Plan, and Distributions under the Plan shall be considered and accomplished on a consolidated basis.

**2.5    Separate Classification of Secured Claims**

Although Non-Lender Secured Claims against each Debtor have been placed in one class for purposes of convenience, each Non-Lender Secured Claim shall be treated as though in a separate class for purposes of voting and receiving Distributions under the Plan.

B    231

## ARTICLE III.
## IDENTIFICATION OF IMPAIRED
## CLASSES OF CLAIMS AND EQUITY INTERESTS

### 3.1    Unimpaired Classes of Claims and Equity Interests

Class 1 (Priority Claims) against each of the Debtors is not impaired under the Plan.

### 3.2    Impaired Classes of Claims and Equity Interests

With the exception of Class 1 (Priority Claims) against each of the Debtors, all classes of Claims against and Equity Interests in each of the Debtors are impaired under the Plan.

### 3.3    Impairment Controversies

If a controversy arises as to whether any Claim or Equity Interest, or any class of Claims or Equity Interests, is impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy.

## ARTICLE IV.
## PROVISIONS FOR TREATMENT OF CLAIMS
## AND EQUITY INTERESTS UNDER THE PLAN

### 4.1    Treatment of Claims and Equity Interests

The classes of Claims against and Equity Interests in each of the Debtors shall be treated under the Plan as follows:

(a)    Class 1 – Priority Claims.  Each holder of an Allowed Priority Claim shall be unimpaired under the Plan and such Allowed Priority Claims shall either be paid in full in Cash on the Effective Date or, pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable and contractual rights of each holder of an Allowed Priority Claim in respect of such Claim shall be fully reinstated and retained, except as provided in section 1124(2)(A)-(C) of the Bankruptcy Code, and the holders of such Allowed Priority Claims shall be paid in full in accordance with such reinstated rights. provided that payment may be made by the Litigation Trust rather than Reorganized IT Group, to the extent the Litigation Trust succeeds to the Debtors' Assets in lieu of Reorganized IT Group.

(b)    Class 2 – Non-Lender Secured Claims.  Each holder of an Allowed Non-Lender Secured Claim shall be impaired under the Plan and, pursuant to section 1129(b) of the Bankruptcy Code, shall, at the election of the Plan Proponents, Reorganized IT Group or the Litigation Trust Trustee (as applicable) in consultation with the Agent, receive one of the following treatment options: (i) each holder of an Allowed Non-Lender Secured Claim shall retain its liens securing its Allowed Non-Lender Secured Claim and receive on account of its Allowed Non-Lender Secured Claim deferred cash payments having a present value on the Effective Date equal to the amount of its Allowed Non-Lender Secured Claim, (ii) each holder of an Allowed Non-Lender Secured Claim shall realize the "indubitable equivalent" of its Allowed Non-Lender Secured Claim, (iii) the property securing the Allowed Non-Lender Secured Claim shall be sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds as provided in clause (i) or (ii) of this subparagraph or (iv) if such Allowed Non-Lender Secured Claim is subject to a valid right of recoupment or setoff, such Claim shall be setoff to the extent of the amount subject to setoff in accordance with sections 506(a) and 553 of the Bankruptcy Code.

(c)    Class 3 – Lender Claims.  Subject to Section 4.2 of the Plan and in accordance with the Plan Settlement, the Lender Claims shall be Allowed in full under the Plan and each holder of an Allowed Lender Claim shall receive on the Effective Date and on any applicable Distribution Date thereafter, in full and complete satisfaction of such Claim. its Pro Rata Share of (i) 87.5% of the Available Proceeds, (ii) 90% of the Shaw Stock.

(iii) 20% of Avoidance Action Recoveries, and (iv) 75% of the first $10,000,000 of Estate Cause of Action Recoveries and 50% of Estate Cause of Action Recoveries thereafter. In the event that holders of Allowed Lender Claims receive distributions from Reorganized IT Group after the Effective Date, the cumulative distributions from IT Group and Reorganized IT Group under this provision to a holder of an Allowed Lender Claim shall not exceed the amount of each holder's Allowed Lender Claim.

(d)   Class 4A – General Unsecured Claims.  Subject to Section 4.2 of the Plan and in accordance with the Plan Settlement, each holder of an Allowed General Unsecured Claim shall receive on the applicable Distribution Date on account of its Allowed General Unsecured Claim, its Pro Rata Share of (i) 12.5% of the Available Proceeds, (ii) the net proceeds from the sale or other disposition of 10% of the Shaw Stock in accordance with the Plan, (iii) 80% of Avoidance Action Recoveries, and (iv) 25% of the first $10,000,000 of Estate Cause of Action Recoveries and 50% of Estate Cause of Action Recoveries thereafter. In the event that holders of Allowed General Unsecured Claims receive distributions from Reorganized IT Group after the Effective Date, the cumulative distributions from IT Group and Reorganized IT Group under this provision to a holder of an Allowed General Unsecured Claim shall not exceed the amount of such holder's Allowed General Unsecured Claim.

(e)   Class 4B – Litigation Unsecured Claims.  Each Litigation Unsecured Claim shall be liquidated pursuant to the Plan ADR.  To the extent any such Claim becomes an Allowed Litigation Unsecured Claim as provided in the Plan ADR, the holder of such Claim shall receive on any applicable Distribution Date on account of its Allowed Litigation Unsecured Claim, its Pro Rata Share of the Distributions to holders of Allowed General Unsecured Claims as provided in Section 4.1(d) of the Plan.  To the extent any Allowed Litigation Unsecured Claim is an Insured Claim, the amount of its Allowed Litigation Unsecured Claim shall be reduced by the amount of insurance proceeds, if any, to pay such Claim, and the Pro Rata Share with respect to such Allowed Litigation Unsecured Claim shall be determined based upon such reduced amount.  In the event that holders of Allowed Litigation Unsecured Claims receive distributions from Reorganized IT Group after the Effective Date, the cumulative distributions from IT Group and Reorganized IT Group under this provision to a holder of an Allowed Litigation Unsecured Claim shall not exceed the amount of each holder's Allowed Litigation Unsecured Claim.

(f)   Class 4C – Securities Litigation Claims.  In accordance with section 510(b) of the Bankruptcy Code, an Allowed Securities Litigation Claim shall be subordinated to all senior classes.  In the event that holders of Allowed Lender Claims, Allowed General Unsecured Claims and Allowed Litigation Unsecured Claims receive distributions under the Plan from Reorganized IT Group after the Effective Date and the cumulative distributions received by all such holders from IT Group and Reorganized IT Group equal the aggregate amount of the Allowed Claims of all such holders and all of such Allowed Claims have been paid in full, then each holder of an Allowed Securities Litigation Claim shall receive its Pro Rata Share of the distributions, if any, by Reorganized IT Group under the Plan in excess of such aggregate amount; provided, however, that under no circumstances shall the distributions under this provision to the holder of an Allowed Securities Litigation Claim exceed the amount of such holder's Allowed Securities Litigation Claim.  Other than the potential to receive the foregoing distribution, each holder of an Allowed Securities Litigation Claim shall not receive or retain any Distribution or consideration on account of such Allowed Securities Litigation Claim.

(g)   Class 4D – Subordinated Claims.  In the event that holders of Allowed Lender Claims, Allowed General Unsecured Claims, Allowed Litigation Unsecured Claims and Allowed Securities Litigation Claims receive distributions under the Plan from Reorganized IT Group after the Effective Date and the cumulative distributions received by all such holders from IT Group and Reorganized IT Group equal the aggregate amount of the Allowed Claims of all such holders and all of such Allowed Claims have been paid in full, then each holder of an Allowed Subordinated Claim shall receive its Pro Rata Share of the distributions, if any, by Reorganized IT Group under the Plan in excess of such aggregate amount; provided, however, that under no circumstances shall the distributions under this provision to the holder of an Allowed Subordinated Claim exceed the amount of such holder's Allowed Subordinated Claim.  Other than the potential to receive the foregoing distribution, each holder of an Allowed Subordinated Claim shall not receive or retain any Distribution or consideration on account of such Allowed Subordinated Claim.

(h)   Class 5 – Equity Interests.  On the Effective Date, all Equity Interests in IT Group shall be cancelled, annulled and extinguished and one share of New Common Stock shall be issued to the Plan Administrator, who shall hold such share for the benefit of the holders of such former Equity Interests consistent

with their former economic entitlements; provided, however, that no such share of New Common Stock shall be issued if IT Group is dissolved effective as of the Effective Date. Other than such beneficial interest (which shall be non-transferable), each holder of an Equity Interest in IT Group shall neither receive nor retain any property or interest in property under the Plan on account of such Equity Interest. All Equity Interests in all of the other Debtors shall be canceled, annulled and extinguished when such Debtors are dissolved or merged out of existence in accordance with Section 7.3 of the Plan, and no distribution of any property shall be made with respect to such Equity Interests. On or promptly after the Effective Date, Reorganized IT Group shall file with the SEC a Form 15 for the purpose of terminating the registration of any of its publicly traded securities. In the event Reorganized IT Group is dissolved after the Effective Date in accordance with Section 7.3 of the Plan, the New Common Stock outstanding after the Effective Date shall be canceled on the date Reorganized IT Group is so dissolved.

**4.2**   Litigation Trust Alternative

At the election of the Agent (on behalf of the Prepetition Lenders) and the Committee, which election shall be made on or prior to the Effective Date, the Debtors shall transfer the Litigation Trust Assets (which may include, without limitation, the Avoidance Actions, the Avoidance Action Recoveries, the Estate Causes of Action, the Estate Cause of Action Recoveries, and any assets the sale, disposition or collection of which, after the Effective Date, would give rise to Available Proceeds) to the Litigation Trust for the benefit of the holders of Allowed Lender Claims, Allowed General Unsecured Claims, and Allowed Litigation Unsecured Claims in accordance with Section 7.10(f) (the "Litigation Trust Alternative"). In such event, in lieu of having a continuing right under the Plan against Reorganized IT Group to receive a portion of any proceeds from the assets transferred to the Litigation Trust, the holders of Allowed Lender Claims, Allowed General Unsecured Claims, and Allowed Litigation Unsecured Claims shall receive beneficial interests in the Litigation Trust entitling them to share in the proceeds of such assets on the same relative basis as provided in Sections 4.1(c), 4.1(d) and 4.1(e) of the Plan.

**ARTICLE V.**
**PROVISIONS FOR TREATMENT**
**OF UNCLASSIFIED CLAIMS UNDER THE PLAN**

**5.1**   Treatment of Administrative Claims

All Administrative Claims shall be treated as follows:

(a)   Time for Filing Administrative Claims. Except as otherwise provided in the Administrative Bar Date Order, the holder of an Administrative Claim, including a Claim under section 503(b) of the Bankruptcy Code, but excluding (i) the Lender Claims, (ii) a Fee Claim, (iii) a liability incurred and payable in the ordinary course of business by a Debtor (and not past due), or (iv) an Administrative Claim that has been Allowed on or before the Effective Date, must file with the Bankruptcy Court and serve on the Debtors and the Office of the United States Trustee, notice of such Administrative Claim within thirty (30) days after service of notice of entry of the Confirmation Order. Such notice must include at a minimum (A) the name of the holder of the Claim, (B) the amount of the Claim, and (C) the basis of the Claim. Failure to file and serve such notice timely and properly shall result in the Administrative Claim being forever barred and discharged.

(b)   Time for Filing Fee Claims. Each Professional Person shall be required to file with the Bankruptcy Court, and serve on all parties required to receive notice, a final Fee Application within sixty (60) days after the Effective Date. As soon as practicable, but in no event later than thirty (30) days after the filing of a final Fee Application, objections to final Fee Applications shall be filed with the Bankruptcy Court and served upon the Professional Person who filed the final Fee Application. The failure to file timely and serve such final Fee Application shall result in the Fee Claim being forever barred and discharged.

(c)   Allowance of Administrative Claims. An Administrative Claim with respect to which notice has been properly filed and served pursuant to Section 5.1(a) of the Plan shall become an Allowed Administrative Claim if no objection is filed within ninety (90) days after the deadline for filing and serving the notice of such Administrative Claim specified in Section 5.1(a) of the Plan, or such later date as may be approved by the Bankruptcy Court on motion of a party in interest, without notice or a hearing. If an objection is filed within such ninety-day period (or any extension thereof), the Administrative Claim shall become an Allowed

B   234

Administrative Claim only to the extent allowed by Final Order. An Administrative Claim with respect to which a Fee Application has been properly filed pursuant to Section 5.1(b) of the Plan shall become an Allowed Administrative Claim only to the extent allowed by Final Order.

(d)    Payment of Allowed Administrative Claims. On the applicable Distribution Date, each holder of an Allowed Administrative Claim shall receive (i) the amount of such holder's Allowed Claim in one Cash payment, or (ii) such other treatment as may be agreed upon in writing by Reorganized IT Group or, if applicable, the Litigation Trust Trustee, and such holder; provided, that an Administrative Claim representing a liability incurred in the ordinary course of business of the Debtors may be paid at Reorganized IT Group's or, if applicable, the Litigation Trust Trustee's, election in the ordinary course of business.

## 5.2    Treatment of Tax Claims

At the election of the Debtors or, on or after the Effective Date, Reorganized IT Group or, if applicable, the Litigation Trust Trustee, each holder of an Allowed Tax Claim shall receive in full satisfaction of such holder's Allowed Tax Claim, (a) the amount of such holder's Allowed Tax Claim, with Post-Confirmation Interest thereon, in equal annual Cash payments on each anniversary of the Effective Date, until the sixth (6th) anniversary of the date of assessment of such Tax Claim (provided that the Disbursing Agent may prepay the balance of any such Allowed Tax Claim at any time without penalty); (b) a lesser amount in one Cash payment as may be agreed upon in writing by such holder and Reorganized IT Group or, if applicable, the Litigation Trust Trustee; or (c) such other treatment as may be agreed upon in writing by such holder and Reorganized IT Group or, if applicable, the Litigation Trust Trustee. The Confirmation Order shall enjoin any holder of a Tax Claim from commencing or continuing any action or proceeding against any responsible person or officer or director of the Debtors that otherwise would be liable to such holder for payment of a Tax Claim so long as no default has occurred with respect to such Tax Claim under this Section 5.2 of the Plan.

The Tax Collector of Palm Beach County has asserted an alleged Tax Claim of approximately $7,900.02. To the extent such Claim becomes an Allowed Tax Claim under the Plan, such Allowed Tax Claim shall be paid in full in Cash on the later of the Effective Date or entry of a Final Order allowing such Tax Claim. The State of Washington, Department of Revenue has also asserted an alleged Tax Claim. To the extent such Claim becomes an Allowed Tax Claim under the Plan, such Allowed Tax Claim shall be paid in full in Cash on the later of the Effective Date or entry of a Final Order allowing such Tax Claim.

## ARTICLE VI.
## ACCEPTANCE OR REJECTION OF THE PLAN;
## EFFECT OF REJECTION BY ONE OR MORE
## CLASSES OF CLAIMS OR EQUITY INTERESTS

### 6.1    Classes Entitled to Vote

Class 2 (Non-Lender Secured Claims), Class 3 (Lender Claims), Class 4A (General Unsecured Claims), and Class 4B (Litigation Unsecured Claims) are impaired under the Plan, and the holders of such Claims shall be entitled to vote to accept or reject the Plan. Class 1 (Priority Claims) is unimpaired under the Plan, and the holders of such Claims are conclusively presumed to have accepted the Plan. Class 4C (Securities Litigation Claims), Class 4D (Subordinated Claims) and Class 5 (Equity Interests) are impaired under the Plan, and the holders of such Claims and Equity Interests shall not receive a Distribution or retain any property under the Plan and are deemed not to have accepted the Plan.

### 6.2    Class Acceptance Requirement

Absent an order of the Court, only holders of Claims that are of record and as to which an objection is not pending as set forth in the Voting Procedures Order shall be entitled to accept or reject the Plan. A class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such class that have voted on the Plan.

**6.3    Confirmation Without Acceptance by All Impaired Classes**

The Plan shall constitute a request that the Bankruptcy Court confirm the Plan over the rejection of any Class in accordance with section 1129(b) of the Bankruptcy Code.

### ARTICLE VII.
### MEANS FOR IMPLEMENTATION OF THE PLAN

**7.1    Substantive Consolidation of Debtors**

Except as otherwise provided in the Plan, on and subject to the occurrence of the Effective Date, all Assets and liabilities of the Debtors shall be substantively consolidated. On the Effective Date (i) all intercompany claims by and among the Debtors shall be eliminated; (ii) all Assets and liabilities of the Debtors other than IT Group shall be merged or treated as though they were merged into and with the Assets and liabilities of IT Group; (iii) all guarantees of the Debtors of the obligations of any other Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors; (iv) all Equity Interests owned by any of the Debtors in any other Debtor shall be treated as though they were eliminated; and (v) each and every Claim filed or to be filed in the Chapter 11 Cases against any of the Debtors shall be deemed filed against the consolidated Debtors, and shall be deemed one Claim against and obligation of the consolidated Debtors.

**7.2    IT Group Subsidiary Guarantees**

All claims based upon guarantees of collection, payment or performance of any obligation of the Debtors made by any Subsidiary which is not a Debtor and all claims against any such Subsidiary for which any of the Debtors are jointly and severally liable, in each case which arise prior to the Effective Date, shall be discharged, released, extinguished and of no further force and effect.

**7.3    Merger and Dissolution of IT Group Corporate Entities**

On or as of the Effective Date or as soon as reasonably practicable thereafter, any or all of the Debtors (other than IT Group) and Subsidiaries of the Debtors may, at the sole option of the Plan Proponents (with the consent of the Agent), be (a) merged into one or more of the Debtors or (b) dissolved; provided, however, that if the Litigation Trust succeeds to all of the Debtors' Assets in lieu of Reorganized IT Group, all of the Debtors (other than IT Group) shall merge into IT Group on or as soon as practicable after the Effective Date and IT Group shall be immediately dissolved. Upon the occurrence of any such merger, all assets of the merged entities shall be transferred to and become the assets of the surviving entity, and all liabilities of the merged entities, except to the extent discharged, released or extinguished pursuant to the Plan and the Confirmation Order, shall be assumed by and shall become the liabilities of the surviving entity, with such liabilities of the surviving entity to be treated as provided in the Plan. All mergers and dissolutions shall be effective as of the Effective Date[1] pursuant to the Confirmation Order without any further action by the stockholders or directors of any of the Debtors, unless applicable law requires otherwise. Following the Effective Date and upon the occurrence of such mergers and dissolutions, Reorganized IT Group or the Litigation Trust Trustee (if applicable) shall move for a final decree to close the chapter 11 case relating to each merged and/or dissolved entity. Reorganized IT Group shall be dissolved when it has made the Distributions, if any, required to be made by it under the Plan.

**7.4    The Plan Settlement**

Pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of a compromise and

---

[1]    Because the Debtor entity Wehran New York, Inc. ("Wehran"), may be subject to purchase by an interested party after the Effective Date, any merger or dissolution of Wehran shall occur, if at all, sixty (60) days after the Effective Date provided that consummation of any sale of Wehran is not pending as of such date.

settlement of all Causes of Action as of the Effective Date by and between the Agent and the Prepetition Lenders, on the one hand, and the Debtors, the Subsidiaries that are not Debtors, and the Committee (and all of its members), on the other hand, pursuant to which, and upon the occurrence of the Effective Date, (a) the Lender Claims shall be deemed Allowed in full as provided in Section 4.1(c) of the Plan, (b) the Committee Lawsuit shall be dismissed with prejudice, (c) any and all claims and Causes of Action of the Debtors (and their Estates), the Subsidiaries that are not Debtors, and the Committee (and all of its members) against the Agent and/or the Prepetition Lenders as of the Effective Date shall be forever waived, discharged, released and enjoined, (d) the holders of Allowed Lender Claims shall receive the treatment accorded such Claims pursuant to the Plan in complete satisfaction thereof, including, without limitation, any subordination or other provisions in respect of the Old Notes, the holders thereof or the Indenture Trustee, and (e) any right to a Distribution on account of any deficiency Claim, Unsecured Claim or Administrative Claim (other than any claims under the Plan or for the reimbursement of all reasonable fees and expenses of the Agent incurred through the date on which the Committee is dissolved in accordance with Section 13.4 of the Plan, which claims shall remain in effect and shall be treated and paid as Administrative Claims in accordance with the Plan without the need to file any Administrative Claim pursuant to the Administrative Bar Date or otherwise comply with Section 5.1 of the Plan) by the holders of the Lender Claims shall be forever waived, discharged, released and enjoined, which Claims shall be deemed satisfied in full by the treatment accorded the Lender Claims in Section 4.1(c) of the Plan. Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of the Plan Settlement and authorize the parties to take all actions that are necessary or appropriate to implement and give effect to the Plan Settlement.

### 7.5    Shaw Stock

Upon the occurrence of the Effective Date in accordance with the Plan Settlement, title to 10% of the Shaw Stock shall vest in Reorganized IT Group or, if applicable, the Litigation Trust, free and clear of all Claims, Equity Interests, liens, security interests, encumbrances, and other interests, except as expressly provided in the Plan, which stock may be sold or otherwise disposed of (as directed by the Plan Administrator with the consent of the Committee Designee) for the benefit of holders of Allowed General Unsecured Claims to effectuate Distributions to such holders in accordance with Section 4.1(d) of the Plan.  Upon the occurrence of the Effective Date in accordance with the Plan Settlement, 90% of the Shaw Stock shall be distributed to the Agent on behalf of the holders of Allowed Lender Claims in accordance with Section 4.1(c) of the Plan, free and clear of all Claims, Equity Interests, liens, security interests, encumbrances, and other interests, except as otherwise expressly provided in the Plan

### 7.6    Formation of Reorganized IT Group

On or before the Effective Date and conditioned on the occurrence of the Effective Date, the following actions shall be taken with respect to Reorganized IT Group (unless the Litigation Trust Alternative is implemented and the Litigation Trust succeeds to all of the Debtors' Assets in lieu of Reorganized IT Group):

       (a)    the New Charter and the New By-Laws shall be duly adopted; and

       (b)    the issuance of the New Common Stock shall be authorized.

Except as otherwise provided in the Plan, the post-Effective Date management of Reorganized IT Group shall be the general responsibility of the Plan Administrator, subject to the direction and supervision by the Oversight Committee as provided in the Plan.

### 7.7    Oversight Committee

On the Effective Date, the Oversight Committee shall be formed, which committee shall consist of four (4) members, two selected by the Committee and two selected by the Agent on behalf of the Prepetition Lenders.  The Oversight Committee shall oversee the administration and implementation of the Plan and the liquidation and distribution of the Debtors' Assets in accordance with the Plan.  Oversight Committee decisions shall be made with the approval of at least three (3) members.  The Oversight Committee shall have the following rights, obligations and duties:

(a)    Approve the Plan Administrator's selection of, as well as the terms governing the engagement of, professionals to be engaged by the Plan Administrator on behalf of Reorganized IT Group or, if applicable, the Litigation Trust, who may have been previously engaged by the Debtors, the Committee and/or the Agent, and establish retainer terms, conditions and budgets;

(b)    Decide whether, when, and in what amounts Distributions should be made, and direct Reorganized IT Group or, if applicable, the Litigation Trust (subject to the provisions of the Litigation Trust Agreement), to make a Distribution;

(c)    Oversee the Plan Administrator's administration and implementation of the Plan and the liquidation of the Assets in accordance with the Plan;

(d)    Oversee, review and guide the Plan Administrator on performance of its duties and its activities proposed and underway, as often as is necessary and appropriate to implement the Plan;

(e)    Appear in Bankruptcy Court;

(f)    Seek an order terminating an Oversight Committee member and approving a replacement selected in a manner consistent with the original selection of such Oversight Committee Member in the event the other members of the Oversight Committee determine there is cause to do so;

(g)    Articulate the Oversight Committee's position in the event the Plan Administrator, the Disbursing Agent or the Chief Litigation Officer brings a dispute with the Oversight Committee to the Bankruptcy Court for resolution, or the Oversight Committee concludes it should bring a dispute with the Plan Administrator, Disbursing Agent or the Chief Litigation Officer to the Bankruptcy Court for resolution; and

(h)    Direct the pursuit and settlement of Estate Causes of Action.

Each Oversight Committee member shall be paid in accordance with the Oversight Committee Compensation, as disclosed at or prior to the Confirmation Hearing and agreed to by the Committee and the Agent. Any disputes between and among the Oversight Committee, its members, Reorganized IT Group or, if applicable, the Litigation Trust, the Plan Administrator, and/or the Chief Litigation Officer shall be resolved by the Bankruptcy Court, and the Plan Administrator shall bring any such dispute to the Bankruptcy Court for resolution if so requested in writing by any of such parties.

Subject to any applicable law, the members of the Oversight Committee shall not be liable for any act done or omitted by any member in such capacity, while acting in good faith and in the exercise of business judgment. Members of the Oversight Committee shall not be liable in any event except for gross negligence or willful misconduct in the performance of their duties hereunder.

Except as otherwise set forth in this Plan and to the extent permitted by applicable law, the members of the Oversight Committee, in the performance of their duties hereunder (the "Indemnified OC Parties"), shall be defended, held harmless and indemnified from time to time by Reorganized IT Group or, to the extent such duties relate to the Litigation Trust, the Litigation Trust (and not any other Person) against any and all losses, claims, costs, expenses and liabilities to which such Indemnified OC Parties may be subject by reason of such Indemnified OC Party's execution of duties pursuant to the discretion, power and authority conferred on such Indemnified OC Party by the Plan or the Confirmation Order; provided, however, that the indemnification obligations arising pursuant to this Section shall not indemnify the Indemnified OC Parties for any actions taken by such Indemnified OC Parties which constitute fraud, gross negligence or intentional breach of the Plan, or the Confirmation Order. Satisfaction of any obligation of Reorganized IT Group or, if applicable, the Litigation Trust, arising pursuant to the terms of this Section shall be payable only from the assets of Reorganized IT Group or, if applicable, the Litigation Trust, including, if available, any insurance maintained by Reorganized IT Group or, if applicable, the Litigation Trust. The indemnification provisions contained herein shall remain available to and be binding upon any future members of the Oversight Committee or the estate of any decedent and shall survive dissolution of Reorganized IT Group.

B  238

## 7.8    Plan Administrator

Upon the occurrence of the Effective Date, the management, control, and operation of Reorganized IT Group shall be the general responsibility of the Plan Administrator, subject to the supervision and direction of the Oversight Committee as provided herein.

Notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, from and after the Effective Date all Avoidance Actions may be compromised and settled by the Plan Administrator according to the following procedures:

(a)    Subject to subsection (b) of Section 7.8 of the Plan, the following settlements or compromises of Estate Causes of Action do not require the review or approval of the Bankruptcy Court:

(i)    The settlement or compromise of an Estate Cause of Action where the amount of recovery sought in any demand or adversary proceeding is $250,000 or less; and

(ii)    The settlement or compromise of an Estate Cause of Action where the difference between the amount of the recovery sought in any demand or adversary proceeding and the amount of the proposed settlement is $250,000 or less; and

(b)    The following settlements or compromises shall be submitted to the Bankruptcy Court for approval:

(i)    Any settlement or compromise not described in subsection 7.8(a) of the Plan; and

(ii)    Any settlement or compromise of an Estate Cause of Action that involves an "Insider," as defined in section 101(31) of the Bankruptcy Code.

With the consent of the Oversight Committee, the Plan Administrator may prosecute or decline to prosecute any Estate Causes of Action, in the exercise of the Plan Administrator's business judgment, subject to the provisions of the Plan. With the consent of the Oversight Committee, the Plan Administrator may settle, release, sell, assign, or otherwise transfer or compromise any Estate Causes of Action, in the exercise of the Plan Administrator's business judgment, subject to the provisions of the Plan, including subsection (a) of this Section 7.8.

With the consent of the Oversight Committee, the Plan Administrator may retain the services of attorneys, accountants, consultants, and other agents, in the business judgment of the Plan Administrator, to assist and advise the Plan Administrator in the performance of its duties hereunder.

The Plan Administrator may bring any dispute concerning the performance of its duties for resolution by the Bankruptcy Court and its reasonable fees and expenses (including attorneys' fees) in connection therewith shall be paid by Reorganized IT Group or, to the extent such dispute involves its duties as co-trustee of the Litigation Trust, the Litigation Trust. The compensation for the Plan Administrator shall be agreed to by the Committee and the Agent and disclosed at or prior to the Confirmation Hearing, and is subject to approval by the Bankruptcy Court.

Subject to any applicable law, the Plan Administrator shall not be liable for any act done or omitted by the Plan Administrator in the performance of its duties hereunder, while acting in good faith and in the exercise of business judgment. The Plan Administrator shall not be liable in any event except for gross negligence or willful misconduct in the performance of its duties hereunder.

Except as otherwise set forth in this Plan and to the extent permitted by applicable law, the Plan Administrator and any attorneys, accountants, consultants, and other agents retained by the Plan Administrator, in the performance of its duties hereunder (the "Indemnified PA Parties"), shall be defended, held harmless and indemnified from time to time by Reorganized IT Group or, to the extent performed in furtherance of the Plan

Administrator's duties as co-trustee of the Litigation Trust, the Litigation Trust (and not any other Person) against any and all losses, claims, costs, expenses and liabilities to which such Indemnified PA Parties may be subject by reason of such Indemnified PA Party's execution of duties pursuant to the discretion, power and authority conferred on such Indemnified PA Party by the Plan or the Confirmation Order; provided, however, that the indemnification obligations arising pursuant to this Section shall not indemnify the Indemnified PA Parties for any actions taken by such Indemnified PA Parties which constitute fraud, gross negligence or intentional breach of the Plan, or the Confirmation Order. Satisfaction of any obligation of Reorganized IT Group or, if applicable, the Litigation Trust arising pursuant to the terms of this Section shall be payable only from the assets of Reorganized IT Group or, if applicable the Litigation Trust, including, if available, any insurance maintained by Reorganized IT Group or, if applicable, the Litigation Trust. The indemnification provisions contained herein shall remain available to and be binding upon any future Plan Administrator or the estate of any decedent and shall survive dissolution of Reorganized IT Group.

7.9    **Chief Litigation Officer**

As of the Effective Date, the Chief Litigation Officer shall be appointed to prosecute the Avoidance Actions. With the consent of the Committee Designees, the Chief Litigation Officer may prosecute or decline to prosecute the Avoidance Actions, in the exercise of the Chief Litigation Officer's business judgment, subject to the provisions of the Plan. With the consent of the Committee Designees, the Chief Litigation Officer may settle, release, sell, assign, or otherwise transfer or compromise the Avoidance Actions, in the exercise of the Chief Litigation Officer's business judgment subject to the provisions of the Plan including subsection (a) of this Section 7.9.

Notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, from and after the Effective Date all Avoidance Actions may be compromised and settled by the Chief Litigation Officer according to the following procedures:

(a)    Subject to subsection (b) of Section 7.9 of the Plan, the following settlements or compromises of Avoidance Actions do not require the review or approval of the Bankruptcy Court:

(i)    The settlement or compromise of an Avoidance Action where the amount of recovery sought in any demand or adversary proceeding is $250,000 or less; and

(ii)    The settlement or compromise of an Avoidance Action where the difference between the amount of the recovery sought in any demand or adversary proceeding and the amount of the proposed settlement is $250,000 or less; and

(b)    The following settlements or compromises shall be submitted to the Bankruptcy Court for approval:

(i)    Any settlement or compromise not described in subsection 7.9(a) of the Plan; and

(ii)    Any settlement or compromise of an Avoidance Action that involves an "insider," as defined in section 101(31) of the Bankruptcy Code.

With the consent of the Committee Designees, and in consultation with the Agent, the Chief Litigation Officer may retain the services of attorneys, accountants, consultants, and other agents, in the business judgment of the Chief Litigation Officer, to assist and advise the Chief Litigation Officer in the performance of its duties hereunder.

The Chief Litigation Officer may bring any dispute concerning the performance of its duties for resolution by the Bankruptcy Court and its reasonable fees and expenses (including attorneys' fees) in connection therewith shall be paid by Reorganized IT Group or, to the extent such dispute involves its duties as co-trustee of the Litigation Trust, the Litigation Trust. The compensation for the Chief Litigation Officer shall be agreed to by the

Committee (in consultation with the Agent) and disclosed at or prior to the Confirmation Hearing, and is subject to approval by the Bankruptcy Court.

Subject to any applicable law, the Chief Litigation Officer shall not be liable for any act done or omitted by the Chief Litigation Officer in the performance of its duties hereunder, while acting in good faith and in the exercise of business judgment. The Chief Litigation Officer shall not be liable in any event except for gross negligence or willful misconduct in the performance of its duties hereunder.

Except as otherwise set forth in this Plan and to the extent permitted by applicable law, the Chief Litigation Officer and any attorneys, accountants, consultants, and other agents retained by the Chief Litigation Officer, in the performance of its duties hereunder (the "Indemnified CLO Parties"), shall be defended, held harmless and indemnified from time to time by Reorganized IT Group or, to the extent performed in furtherance of the Chief Litigation Officer's duties as co-trustee of the Litigation Trust, the Litigation Trust (and not any other Person) against any and all losses, claims, costs, expenses and liabilities to which such Indemnified CLO Parties may be subject by reason of such Indemnified CLO Party's execution of duties pursuant to the discretion, power and authority conferred on such Indemnified CLO Party by the Plan or the Confirmation Order; provided, however, that the indemnification obligations arising pursuant to this Section shall not indemnify the Indemnified CLO Parties for any actions taken by such Indemnified CLO Parties which constitute fraud, gross negligence or intentional breach of the Plan, or the Confirmation Order. Satisfaction of any obligation of Reorganized IT Group or, if applicable, the Litigation Trust, arising pursuant to the terms of this Section shall be payable only from the assets of Reorganized IT Group or, if applicable, the Litigation Trust, including, if available, any insurance maintained by Reorganized IT Group or, if applicable, the Litigation Trust. The indemnification provisions contained herein shall remain available to and be binding upon any future Chief Litigation Officer or the estate of any decedent and shall survive dissolution of Reorganized IT Group.

## 7.10    Trusts

### (1)    The Litigation Trust

(a)    Execution of Litigation Trust Agreement. In the event the Agent (on behalf of the Prepetition Lenders) and the Committee elect to pursue the Litigation Trust Alternative, the Litigation Trust Agreement, in a form reasonably acceptable to the Agent (on behalf of the Prepetition Lenders) and the Committee, shall be executed on or before the Effective Date, and all other necessary steps shall be taken to establish the Litigation Trust and the beneficial interests therein, which shall be for the benefit of the holders of Allowed Lender Claims, Allowed General Unsecured Claims and Allowed Litigation Unsecured Claims. This Section 7.10(1) sets forth certain of the rights, duties, and obligations of the Litigation Trust Trustee, in the event such an election is made. In the event that no such election is made, the remainder of this Section 7.10(1) shall be of no further force or effect. In the event of any conflict between the terms of this Section and the terms of the Litigation Trust Agreement the terms of the Litigation Trust Agreement shall govern.

(b)    Purpose of Litigation Trust. The Litigation Trust shall be established for the sole purpose of liquidating and distributing its assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

(c)    Litigation Trust Assets. The Litigation Trust shall consist of the Litigation Trust Assets. Any Cash or other property received from third parties from the prosecution, settlement, or compromise of the Avoidance Actions and/or the Estate Causes of Action shall constitute Litigation Trust Assets for purposes of distributions under the Litigation Trust. On the Effective Date, the Debtors shall transfer all of the Litigation Trust Assets to the Litigation Trust free and clear of all liens, claims, and encumbrances, except to the extent otherwise provided herein or in the Litigation Trust Agreement.

(d)    Governance of Litigation Trust. The Litigation Trust shall be governed and administered by the Litigation Trust Trustee, subject to the supervision of the Oversight Committee (or, in the case of the prosecution, settlement or other disposition of Avoidance Actions, the supervision of the Committee Designees), in each case, as provided under the Plan and the Litigation Trust Agreement. Notwithstanding anything to the contrary herein, the Oversight Committee (and the Committee Designees, as applicable) shall act in furtherance of, and

B    241

consistent with, the purpose of the Litigation Trust and shall act in the best interests of the beneficiaries of the Litigation Trust.

      (e)     Role of the Litigation Trust Trustee.

           (i)     In furtherance of and consistent with the purpose of the Litigation Trust and the Plan, the Litigation Trust Trustee shall (A) have the power and authority to hold, manage, sell, and distribute the Litigation Trust Assets to the holders of Allowed Lender Claims, Allowed General Unsecured Claims and Allowed Litigation Unsecured Claims, (B) hold the Litigation Trust Assets for the benefit of the holders of Allowed Lender Claims, Allowed General Unsecured Claims and Allowed Litigation Unsecured Claims, (C) have the power and authority to hold, manage, sell, and distribute Cash or non-Cash Litigation Trust Assets obtained through the exercise of its power and authority, (D) have the power and authority to prosecute and resolve, in the names of the Debtors and/or the name of the Litigation Trust Trustee, the Avoidance Actions and the Estate Causes of Action, (E) have the power and authority to perform such other functions as are provided in the Plan, and (F) have the power and authority to administer the closure of the Chapter 11 Cases. The Litigation Trust Trustee shall be responsible for all decisions and duties with respect to the Litigation Trust and the Litigation Trust Assets. In all circumstances, the Litigation Trust Trustee shall act in the best interests of all beneficiaries of the Litigation Trust and in furtherance of the purpose of the Litigation Trust.

           (ii)     If and to the extent the Litigation Trust Agreement so provides, the Litigation Trust Trustee shall (A) be authorized to exercise all powers regarding the Debtors' tax matters, including filing tax returns, to the same extent as if the Litigation Trust Trustee were the debtor-in-possession, (B) complete and file the Debtors' federal, state, and local tax returns, (C) request an expedited determination of any unpaid tax liability of the Debtors under section 505(b) of the Bankruptcy Code for all tax periods of the Debtors ending after the Commencement Date through the liquidation of the Debtors as determined under applicable tax laws to the extent not previously requested, and (D) represent the interest and account of the Debtors before any taxing authority in all matters, including, but not limited to, any action, suit, proceeding, or audit.

      (f)     Cash. The Litigation Trust Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code; provided, however, that such investments are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

      (g)     Compensation of the Litigation Trust Trustee. The Litigation Trust Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy proceedings.

      (h)     Distribution of Litigation Trust Assets. The Litigation Trust Trustee shall distribute at least annually and in accordance with the Litigation Trust Agreement, beginning on the Effective Date or as soon thereafter as is practicable, the Litigation Trust Assets on hand (including any Cash received from the Debtors on the Effective Date, and treating as Cash for purposes of this Section 7.10(T)(h) any permitted investments under Section 7.10(T)(f) of the Plan), except such amounts (i) as are reasonably necessary to meet contingent liabilities and to maintain the value of the Litigation Trust Assets during liquidation, (ii) to pay reasonable expenses (including, but not limited to, any taxes imposed on the Litigation Trust or in respect of the Litigation Trust Assets), and (iii) to satisfy other liabilities incurred by the Litigation Trust in accordance with this Plan or the Litigation Trust Agreement.

      (i)     Retention of Professionals by the Litigation Trust Trustee. The Litigation Trust Trustee may retain and reasonably compensate counsel and other professionals to assist in its duties as Litigation Trust Trustee on such terms as the Litigation Trust Trustee deems appropriate without Bankruptcy Court approval. The Litigation Trust Trustee may retain any professional who represented parties in interest in the Chapter 11 Cases.

(j)    Federal Income Tax Treatment of Litigation Trust.

(i)    Litigation Trust Assets Treated as Owned by Certain Creditors. For all federal income tax purposes, all parties (including, without limitation, the Debtors, the Litigation Trust Trustee, the holders of Lender Claims, the holders of General Unsecured Claims and the holders of Litigation Unsecured Claims) shall treat the transfer of the Litigation Trust Assets to the Litigation Trust for the benefit of the holders of Allowed Lender Claims, Allowed General Unsecured Claims and Allowed Litigation Unsecured Claims, whether Allowed on or after the Effective Date, as (A) a transfer of the Litigation Trust Assets directly to the holders of Allowed Lender Claims, Allowed General Unsecured Claims and Allowed Litigation Unsecured Claims in satisfaction of such Claims (and in the case of Contested Unsecured Claims, the Contested Unsecured Claims Reserve) followed by (B) the transfer by such holders to the Litigation Trust of the Litigation Trust Assets in exchange for beneficial interests in the Litigation Trust. Accordingly, the holders of such Claims shall be treated for federal income tax purposes as the grantors and owners of their respective shares of the Litigation Trust Assets.

(ii)    Tax Reporting.

(A)    The Litigation Trust Trustee shall file returns for the Litigation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this Section 7.10(j). The Litigation Trust Trustee shall also annually send to each record holder of a beneficial interest a separate statement setting forth the holder's share of items of income, gain, loss, deduction, or credit and shall instruct all such holders to report such items on their federal income tax returns or to forward the appropriate information to the beneficial holders with instructions to report such items on their federal income tax returns. The Litigation Trust Trustee shall also file (or cause to be filed) any other statements, returns, or disclosures relating to the Litigation Trust that are required by any governmental unit.

(B)    Allocations of Litigation Trust taxable income shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restrictions on distributions described herein) if, immediately prior to such deemed distribution, the Litigation Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the holders of the Litigation Trust interests (including the Contested Unsecured Claims Reserve), taking into account all prior and concurrent distributions from the Litigation Trust. Similarly, taxable loss of the Litigation Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Litigation Trust Assets. The tax book value of the Litigation Trust Assets for this purpose shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Internal Revenue Code, the regulations and another applicable administrative and judicial authorities and pronouncements.

(C)    As soon as possible after the Effective Date, the Litigation Trust Trustee shall make a good faith valuation of the Litigation Trust Assets. Such valuation shall be made available from time to time, to the extent relevant and used consistently by all parties (including, without limitation, the Debtors, the Litigation Trust Trustee, and the holders of Allowed Lender Claims, Allowed General Unsecured Claims and Allowed Litigation Unsecured Claims) for all federal income tax purposes.

(D)    The Litigation Trust Trustee may request an expedited determination of taxes of the Litigation Trust under section 505(b) of the Bankruptcy Code for all returns filed for. or on behalf of, the Litigation Trust for all taxable periods through the dissolution of the Liquidating Trust.

(k)    Noncertificated Litigation Trust Interests. The beneficial interests in the Litigation Trust shall not be certificated, except as otherwise provided in the Litigation Trust Agreement.

(l)    Dissolution. The Litigation Trust Trustee and the Litigation Trust shall be discharged or dissolved, as the case may be, at such time as (i) all Litigation Trust Assets have been liquidated, and (ii) all distributions required to be made by the Litigation Trust Trustee under the Plan have been made, but in no event shall the Litigation Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court upon motion within the six (6) month period prior to the fifth (5th) anniversary (and, in the case of any extension, within six (6) months prior to the end of such extension), determines that a fixed period extension (not to exceed

three (3) years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Litigation Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Litigation Trust Assets or the dissolution of the Debtors.

(m)     Securities Exempt.  The issuance of the beneficial interests in the Litigation Trust satisfies the requirements of section 1145 of the Bankruptcy Code and, therefore, such issuance is exempt from registration under the Securities Act of 1933, as amended, and any state or local law requiring registration.

(II)     IT Environmental Liquidating Trust

Pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, entry of the Confirmation Order shall constitute approval of that certain IT Environmental Liquidating Trust Agreement reached with the DTSC in connection with the Consent Order and the Landfills, pursuant to which, on or after the occurrence of the Effective Date, the Debtors shall (a) establish the IT Environmental Liquidating Trust for the purpose of operating and providing for the closure and post closure management of the Landfills and liquidating, and distributing the proceeds from the IT Environmental Liquidating Trust Assets; (b) transfer the IT Environmental liquidating Trust Funding to the IT Environmental Liquidating Trust; and (c) transfer the IT Environmental Liquidating Trust Assets to settle the IT Environmental Liquidating Trust which IT Environmental Liquidating Trust Assets shall consist of the following Assets:

(a)     The Post Closure Insurance Policy Assets:  (i) the Post Closure Insurance Policies; (ii) the proceeds from claims paid by the Post Closure Insurance Policies; and (iii) any interest earned on the proceeds from claims paid by the Post Closure Insurance Policies. all subject to DTSC's rights under the policies;

(b)     The Properties:  (i) the real property containing the Vine Hill and Panoche sites which are each owned by the LLCs; and (ii) the real property containing the Benson Ridge and Montezuma Hills Landfills which are owned by IT Corporation;

(c)     The Landfill Assets:  (i) all of Debtors' membership interests in the LLCs; (ii) all real property, personal property, equipment, bank accounts. and employees associated with operations of the Landfills; (iii) all other funds obtained by the Debtors from other parties in settlement or resolution of contribution or cost recovery claims of the Debtors with respect to the Landfills; (iv) all insurance policies held by the LLCs or the IT Environmental Liquidating Trust, all insurance policies held by the Debtors that are associated with the operations of the Landfills, and all proceeds and all proceeds related therefrom other than the Post Closure Insurance Policies; (v) all licenses, permits (subject to the Permit Transfer provision set forth in this Section 7.10(II)) and contracts relating to the Landfills; and (vi) revenues from the operations of the Landfills or development thereon; and

(d)     The Landfill Liabilities:  (i) all accounts payable arising prior to and after the Effective Date associated with the operations of the Landfills; and (ii) all cure obligations associated with the executory contracts and unexpired leases that are assumed by the Debtors and assigned to the IT Environmental Liquidating Trust in accordance with Section 11.1 of the Plan.

Nothing in the Plan or the IT Environmental Liquidating Trust Agreement creates any interest in. or claim against, the Post Closure Insurance Policies beyond the Debtors' interest in the policies as set forth in the Post Closure Insurance Policies themselves.

On or before the Effective Date and subject to the occurrence of the Effective Date, the LLCs and, where appropriate, the Debtors shall (i) execute the IT Environmental Liquidating Trust Agreement; (ii) take all other steps necessary or appropriate to establish the IT Environmental Liquidating Trust; and (iii) to the extent necessary, transfer, deliver and assign to the IT Environmental Liquidating Trust all IT Environmental Liquidating Trust Assets.  At the termination of the IT Environmental Liquidating Trust, the IT Environmental Liquidating Trustee is authorized and directed to designate one or more charitable organizations which are qualified under Section 501(c)(3) of the Internal Revenue Code, and unrelated to the IT Environmental Liquidating Trustee, as the remainder beneficiaries of the IT Environmental Liquidating Trust.  During the term of the IT Environmental

Liquidating Trust, the IT Environmental Liquidating Trust will be a reporting entity for federal income tax purposes under Subpart A of Subchapter J of the Internal Revenue Code.

Permit Transfer: Ownership of the Permits shall be transferred to the IT Environmental Liquidating Trust (or, if appropriate, to the LLCs) upon DTSC approval of Class I Permit Modifications to recognize the transfer of ownership, or if no such approval is required, upon the establishment of the IT Environmental Liquidating Trust.

The IT Environmental Liquidating Trust shall be established and administered pursuant to the law of California and subject to the jurisdiction of the Northern District of California. Nothing in the Plan or IT Environmental Liquidating Trust Agreement, or in negotiations leading to the formation of these instruments, shall be construed as a waiver by the State of California, DTSC, or by any other California state agency, department, board, or commission ("State of California") of Eleventh Amendment immunity, or as consent to be sued or otherwise compelled to appear in any Federal Court, including the Northern District of California and the Bankruptcy Court.

Nothing in this Plan is intended to be nor shall it be construed as a deprivation or waiver by the State of California of any rights and duties as a regulator under the laws of California or the United States, including, without limitation, the Permits, nor affect the State of California's interest, if any, in the Post Closure Insurance Policies.

The Consent Order and the Permits shall be assigned to and accepted by the IT Environmental Liquidating Trust and as such shall survive confirmation of the Plan and continue in full force and effect, subject to, if necessary, Class I Permit Modifications to recognize the transfer of the Permits.

On or before the Effective Date and subject to the occurrence of the Effective Date, all books and records of the Debtors requested by the IT Environmental Liquidating Trustee pertaining to the Landfills and the Post Closure Insurance Policies (the "Landfill Books and Records"), shall be transferred to the IT Environmental Liquidating Trust; provided, however, that to the extent the Debtors, Reorganized IT Group and/or the Litigation Trust Trustee request a copy of the Landfill Books and Records to defend and resolve Claims, the IT Environmental Liquidating Trustee shall provide a copy at the Debtors' expense for reasonable copy charges. Reorganized IT Group and its agents and representatives, including former counsel for the Debtors, shall take all steps, and execute all documents, necessary to cause the transfer of all of the Landfill Books and Records of the Debtors in accordance with this Plan.

Any attorney client privilege, work product privilege or other privilege or immunity attaching to the Landfill Books and Records or communications (whether written or oral) (the "Communications") transferred to the IT Environmental Liquidating Trust shall not be deemed waived and shall automatically vest in the IT Environmental Liquidating Trustee and his representatives. After all Distributions and after implementation of the Plan and the establishment of the IT Environmental Liquidating Trust, no Person other than the IT Environmental Liquidating Trustee shall have the right to assert or waive any such privilege of the Debtors regarding the Landfill Books and Records and/or the Communications.

The IT Environmental Liquidating Trustee shall administer the IT Environmental Liquidating Trust in accordance with the terms and conditions of the IT Environmental Liquidating Trust Agreement, the Plan, and the Confirmation Order, and shall have those duties and powers set forth in the IT Environmental Liquidating Trust Agreement. The IT Environmental Liquidating Trustee may retain the services of attorneys, accountants, consultants and other agents, in the business judgment of the IT Environmental Liquidating Trustee, to assist and advise the IT Environmental Liquidating Trustee in the performance of its duties hereunder. In addition to reimbursement of reasonable, actual and necessary expenses incurred, the IT Environmental Liquidating Trustee shall be entitled to reasonable compensation and benefits that shall be payable by the IT Environmental Liquidating Trust in the ordinary course of business and not subject the approval by the Northern District of California, as set forth in the IT Environmental Liquidating Trust Agreement.

All costs and expenses related to the IT Environmental Liquidating Trust shall be paid from the IT Environmental Liquidating Trust Assets. Under no circumstances shall Reorganized IT Group or the Litigation

Trust have any responsibility or liability for such costs and expenses and under no circumstances shall such costs and expenses be paid from the Administrative Reserve or from the Administrative Surcharge.

In addition to all powers enumerated in the IT Environmental Liquidating Trust Agreement, from and after the transfer of the IT Environmental Liquidating Trust Assets into the IT Environmental Liquidating Trust, the IT Environmental Liquidating Trust shall succeed to all of the rights of the Debtors necessary to protect, conserve, preserve, and liquidate all IT Environmental Liquidating Trust Assets, including but not limited to the enforcement of the Debtors' rights under agreements approved by prior orders of the Northern District of California and rights under prior orders of the Northern District of California. In this capacity, the IT Environmental Liquidating Trust shall have the exclusive power to prosecute, defend, compromise, settle and otherwise deal with all IT Environmental Liquidating Trust Assets subject to the terms and conditions of the IT Environmental Liquidating Trust Agreement, the Plan and the Confirmation Order; provided, however, that the IT Environmental Liquidating Trustee shall file semi-annual status reports with the Northern District of California, with copies to counsel for the DTSC, and the United States Trustee. Such reports shall include actual expenditures from the previous twelve (12) month period and projected expenditures for the future twelve (12) month period.

Neither the IT Environmental Liquidating Trustee, nor any director, officer or employer of the IT Environmental Liquidating Trust or the LLCs shall be personally liable, in connection with the IT Environmental Liquidating Trust, to any Creditor or Beneficiary of the IT Environmental Liquidating Trust, or any other Person, except in the case of fraud, gross negligence or willful conduct. Neither the IT Environmental Liquidating Trustee nor any director, officer or employee of the IT Environmental Liquidating Trust shall be considered an "operator" of the Landfills. Persons who assert claims against the IT Environmental Liquidating Trust, shall look only to the IT Environmental Liquidating Trust Assets to satisfy any liability incurred by the IT Environmental Liquidating Trust, the IT Environmental Liquidating Trustee, or any director, officer or employee of the IT Environmental Liquidating Trust to carry out the terms of the Plan, the Confirmation Order and the IT Environmental Liquidating Trust Agreement. The IT Environmental Liquidating Trustee is entitled to rely upon and shall have no liability in relying upon the advice of professionals retained by the IT Environmental Liquidating Trust. This Section 7.10(II) is not to be construed as a waiver by the DTSC of any and all laws applicable to the activities of the IT Environmental Liquidating Trust, or of its rights, if any, under the Post Closure Insurance Policies.

Except as otherwise set forth in this Plan or in the IT Environmental Liquidating Trust Agreement, the IT Environmental Liquidating Trustee and any director, officer or employee of the IT Environmental Liquidating Trust (collectively, the "Indemnified ELT Parties") shall be defended, held harmless and indemnified from time to time by the IT Environmental Liquidating Trust (and not any other Person) against any and all losses, claims, costs, expenses and liabilities to which such Indemnified ELT Parties maybe subject by reason of such Indemnified ELT Party's execution of duties pursuant to the discretion, power and authority conferred on such Person by the IT Environmental Liquidating Trust Agreement, the Plan or the Confirmation Order; provided, however, that the indemnification obligations arising pursuant to this Section shall not indemnify the Indemnified ELT Parties for any actions taken by such Persons which constitute fraud, gross negligence or intentional breach of the Plan, Confirmation Order or the IT Environmental Liquidating Trust Agreement. Satisfaction of any obligation of the IT Environmental Liquidating Trust arising pursuant to the terms of this Section shall be payable only from the IT Environmental Liquidating Trust Assets, including, if available, any insurance maintained by the IT Environmental Liquidating Trust. The indemnification provisions of the IT Environmental Liquidating Trust Agreement shall remain available to and be binding upon any future IT Environmental Liquidating Trustee or the estate of any decedent and shall survive termination of the IT Environmental Liquidating Trust.

The LLCs and the IT Environmental Liquidating Trust shall provide DTSC and its authorized officers, employees, representatives, as well as contractors, agents and consultants performing response actions under State of California oversight, right of access to the Landfills as required by the Permits. Notwithstanding any provision of this Plan, the State of California retains all of its access authorities and rights, including enforcement rights related thereto, under the Solid Waste Disposal Act, 42 U.S.C. § 6901 et. seq., and any other applicable State of California statute or regulation, including any amendments thereto. The LLCs and the IT Environmental Liquidating Trust do not waive, but retain all rights, claims, and causes of action against all non-governmental third parties which may gain access to the Landfills pursuant to the Plan or otherwise.

Prior to Termination, as defined in the IT Environmental Liquidating Trust Agreement, of the IT Environmental Liquidating Trust, the IT Environmental Liquidating Trustee shall provide a final accounting as required by the Northern District of California.

Any conflicts between this Plan and the IT Environmental Liquidating Trust Agreement shall be resolved by reference to the terms of the IT Environmental Liquidating Trust Agreement.

## 7.11   Vesting of Assets of Debtors

Upon the occurrence of the Effective Date and except as otherwise provided in the Plan, title to all of the Assets of the Debtors shall vest in Reorganized IT Group, the respective reorganized Debtor, or the Litigation Trust (if applicable), free and clear of all Claims, Equity Interests, liens, security interests, encumbrances and other interests. Subject to the Plan and direction by the Oversight Committee, Reorganized IT Group, any other reorganized Debtor, or the Litigation Trust (if applicable) may use, acquire and otherwise dispose of its Assets free of any restrictions of the Bankruptcy Code on and after the occurrence of the Effective Date.

## 7.12   Reconstitution of Board of Directors

If applicable, the initial board of directors of Reorganized IT Group shall be composed of the individuals identified at or prior to the Confirmation Hearing. Effective as of the Effective Date, the current board of directors of the IT Group shall be dissolved and, if applicable, the board of directors of Reorganized IT Group shall be selected and determined in accordance with the provisions of the New Charter and the New By-Laws for Reorganized IT Group.

## 7.13   The New Charter and the New By-Laws

If applicable, upon the occurrence of the Effective Date, the charter and by-laws of Reorganized IT Group shall be amended and restated in substantially the form of the New Charter and New By-Laws, to, among other things, (a) prohibit the issuance of nonvoting equity securities as required by section 1123(a)(6) of the Bankruptcy Code, subject to further amendment of the New Charter as permitted by applicable law, and (b) otherwise effectuate the provisions of the Plan.

## 7.14   Cancellation of Instruments and Agreements

Upon the occurrence of the Effective Date, except as otherwise provided herein, all promissory notes, share certificates, instruments, indentures, or agreements evidencing, giving rise to or governing any Claim or Equity Interest shall be deemed canceled and annulled without further act or action under any applicable agreement, law, regulation, order or rule, and the obligations of the Debtors under such promissory notes, share certificates, instruments, indentures or agreements shall be discharged. The Indentures shall survive confirmation of the Plan solely to effectuate Distributions to be made to holders of the Old Notes as provided herein and to enforce the rights, duties and administrative functions of the Indenture Trustee as provided herein and therein with respect to such Distributions. Nothing in the Plan shall be deemed to impair, waive or discharge the Indenture Trustee's charging lien or any other rights or obligations of the Indenture Trustee under the Indentures. Upon final Distribution to the holders of the Old Notes pursuant to the Plan, the Indentures shall be canceled and deemed terminated, and the Indenture Trustee shall be discharged of any further duties, without any further act or action under any applicable agreement, law, regulations, order, or rule and the obligations of the Debtors under each Indentures shall be discharged.

## 7.15   Expenses Incurred and Claims of the Indenture Trustee

The reasonable unpaid fees and expenses of the Indenture Trustee incurred in the performance of the Indenture Trustee's duties under the Indentures through the Effective Date shall be treated as an Allowed Administrative Claim to be paid in accordance with Article V of the Plan. From and after the Effective Date and subject to the approval of the Oversight Committee, Reorganized IT Group or, if applicable, the Litigation Trust,

B   247

shall, in the ordinary course of business and without the necessity of approval by the Bankruptcy Court, pay the reasonable fees and expenses of the Indenture Trustee related to implementation and consummation of the Plan.

## 7.16    Causes of Action

Except as otherwise expressly provided in the Plan, all Causes of Action assertable by any of the Debtors or their Estates, successors or assigns, including but not limited to (i) the Causes of Action listed on Exhibit 1 annexed to the Plan, (ii) Avoidance Actions and Estate Causes of Action and (iii) those Causes of Action hereinafter arising or discovered, regardless of when the facts giving rise to such Causes of Action arose or existed, shall be retained by, and vested in, Reorganized IT Group or, if applicable, the Litigation Trust, upon the occurrence of the Effective Date. Exhibit 1 to the Plan is a non-exhaustive list of the Causes of Action to be retained in connection with the Plan and the Plan Proponents reserve the right to amend that list up to the deadline for filing objections to the Plan. Except as otherwise provided in the Plan, the right of the Debtors, Reorganized IT Group or the Litigation Trust to commence and prosecute such Causes of Action (including Avoidance Actions and Estate Causes of Action) shall be preserved notwithstanding consummation of the Plan. Any recovery realized by Reorganized IT Group or the Litigation Trust on account of such Causes of Action shall be the property of Reorganized IT Group or, if applicable, the Litigation Trust, and, except as otherwise provided in the Plan, distributed to holders of Allowed Claims or the holders of the beneficial interests in the Litigation Trust in accordance with the Plan. Failure to list any claim, right of action, suit or proceeding on Exhibit 1 to the Plan shall not constitute a waiver or release by the Committee, the Debtors, their Estates, Reorganized IT Group or the Litigation Trust of any such claim, right of action, suit or proceeding, and all such claims, rights of action suits or proceedings are hereby expressly reserved.

## 7.17    Approval of the Plan Settlement

The Confirmation Order shall approve the Plan Settlement and authorize the parties to take all actions that are necessary or appropriate to implement and give effect to the Plan Settlement, subject to the occurrence of the Effective Date.

## 7.18    Employee Matters

(a)     Upon the occurrence of the Effective Date, the Debtors shall remit any payments outstanding as of the Effective Date that are due and payable pursuant to the terms of that certain Severance/Retention Program approved by the Bankruptcy Court by order dated August 29, 2002.

(b)     Upon the occurrence of the Effective Date, the Soose Loans and accrued interest thereon shall be deemed to be forgiven. Within three (3) business days of the Effective Date, the Debtors shall remit all federal, state and local withholding taxes and all related interest associated with the loan forgiveness and the corresponding salary gross-up so that Harry J. Soose, Jr., incurs no personal out-of-pocket expenses.

## 7.19    Special Provisions Regarding Insured Claims

Distributions under the Plan to each holder of an Allowed Insured Claim against any Debtor shall be in accordance with the treatment provided under the Plan for the Class in which such Allowed Insured Claim is classified; provided, however, that any Distribution under the Plan on account of an Allowed Insured Claim shall, for purposes of calculating the Allowed amount of such Claim, deduct the amount of any insurance proceeds actually received by such holder in respect of such Allowed Insured Claim. Nothing in this Section 7.19 shall constitute a waiver of any claim, right or Cause of Action the Debtors or their Estates may hold against any Person, including any Insurance Companies or other insurers. Pursuant to section 524(e) of the Bankruptcy Code, nothing in the Plan shall release or discharge any Insurance Company or other insurer from any obligations to any Person under applicable law or any policy of insurance under which a Debtor is an insured or beneficiary.

### 7.20    Appointment of the Disbursing Agent

Upon the occurrence of the Effective Date, Reorganized IT Group or, if applicable, the Litigation Trust, shall be appointed to serve as the Disbursing Agent with respect to all of the Debtors.

### 7.21    Sources of Cash for Plan Distributions

All Cash necessary for the Disbursing Agent to make payments and Distributions pursuant to the Plan shall be obtained from existing Cash balances and the disposition of the Assets pursuant to the Plan.

### 7.22    Sources of Cash for Implementation of Plan

Pursuant to the Plan Settlement, the Administrative Reserve shall be held in an account maintained by Reorganized IT Group or, if applicable, the Litigation Trust, to fund post-Effective Date administrative and related costs associated with administration of the Chapter 11 Cases and implementation of the Plan including, without limitation, the fees and costs of the Disbursing Agent, Reorganized IT Group, the Litigation Trust, the Plan Administrator, the Chief Litigation Officer and the Oversight Committee pursuant to the Plan. Notwithstanding the foregoing, under no circumstances shall the Administrative Reserve be used to fund any costs or expenses of, or relating to, the IT Environmental Liquidating Trust. To the extent the Administrative Reserve is insufficient to fund administration of the Chapter 11 Cases and implementation of the Plan, an Administrative Surcharge against the Litigation Recoveries may be approved and authorized by (a) the Oversight Committee; or (b) the Bankruptcy Court upon application by the Plan Administrator, the Chief Litigation Officer, the Committee Designees, the Agent, the Lender Designees and/or the Oversight Committee, upon notice to Reorganized IT Group or the Litigation Trust (if applicable), the Plan Administrator, the Chief Litigation Officer, the Oversight Committee, the Agent and any other party in interest as directed by the Bankruptcy Court. Under no circumstances shall the Administrative Surcharge be used to fund any costs or expenses of, or relating to, the IT Environmental Liquidating Trust. In the event any monies remain in the Administrative Reserve (including any monies obtained as a result of any Administrative Surcharge) at the time of the final Distribution to be made pursuant to the Plan, such remaining monies shall constitute Available Proceeds and shall be distributed as provided in Sections 4.1(c) and 4.1(d) of the Plan.

### 7.23    Investment of Funds Held by the Disbursing Agent; Tax Reporting by the Disbursing Agent

Subject to section 7.10(I)(f) of the Plan, the Disbursing Agent may, but shall not be required to, invest any funds held by the Disbursing Agent pending the distribution of such funds pursuant to the Plan in investments that are exempt from federal, state and local taxes.

### 7.24    Distributions under the Plan

The Disbursing Agent shall make all Distributions required under the Plan. Whenever any Distribution to be made under this Plan shall be due on a day other than a Business Day, such Distribution shall instead be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due. A Distribution shall be allocated to the principal amount of a Claim (as determined for federal income tax purposes) first and then, to the extent the Distribution exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest.

### 7.25    Timing of Distributions under the Plan

Except for the initial Distribution to holders of Allowed Lender Claims (which shall be made on the Effective Date), any Distribution to be made pursuant to the Plan other than Section 7.10(I) of the Plan shall be deemed to have been timely made if made within the ten (10) Business Days immediately following the applicable Distribution Date.

7.26    Address for Delivery of Distributions under the Plan

Subject to Bankruptcy Rule 9010, any Distribution or delivery to a holder of an Allowed Claim shall be made at the address of such holder as set forth on the proof of Claim filed by such holder (or at the last known address of such holder if no proof of claim is filed or if the Disbursing Agent, the Debtors, Reorganized IT Group or the Litigation Trust Trustee, as the case may be, have been notified of a change of address); provided, that all Distributions under the Plan to the holders of Allowed General Unsecured Claims based on the Old Notes shall be made to the Indenture Trustee with respect thereto. All Distributions under the Plan to the holders of the Lender Claims shall be made to the Agent for Distribution to such holders. If any holder's Distribution or payment is returned to the Disbursing Agent as undeliverable, no further Distributions or payments to such holder shall be made unless and until the Disbursing Agent is notified of such holder's then current address within three months after such Distribution or payment was returned, at which time any missed Distribution or payment shall be made to such holder without interest.

7.27    Time Bar to Cash Payments

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within one hundred and eighty (180) days after the date of issuance thereof. Requests for reissuance of any check shall be made directly to the Disbursing Agent by the holder of the Allowed Claim with respect to which such check originally was issued. All Claims in respect of void checks as provided herein shall be discharged and forever barred and such unclaimed Distributions or payments shall revert to Reorganized IT Group or the Litigation Trust (if applicable).

7.28    Manner of Payment under the Plan

Unless the Person receiving a Distribution agrees otherwise, any Distribution to be made in Cash under the Plan shall be made, at the election of the Disbursing Agent, by check drawn on a domestic bank or by wire transfer from a domestic bank.

7.29    Expenses Incurred on or after the Effective Date and
Claims of the Disbursing Agent

Professional fees and expenses incurred by the Disbursing Agent from and after the Effective Date in connection with the effectuation of the Plan shall be paid in the ordinary course of business by Reorganized IT Group or the Litigation Trust (if applicable). Any dispute regarding compensation shall be resolved by agreement of the parties or if the parties are unable to agree, as determined by the Bankruptcy Court.

7.30    Fractional Distributions

Notwithstanding anything to the contrary contained herein, no Cash payments of fractions of cents and no fractional distributions of shares of the Shaw Stock shall be made. Fractional cents shall be rounded down to the nearest whole cent. Fractional shares shall be rounded down to the next-lower whole number of shares.

7.31    Corporate Action

On the Effective Date, if applicable, the adoption of the New Charter, the filing by Reorganized IT Group of the New Charter and the adoption of the New By-Laws and the other corporate actions, as contemplated by Article VII of the Plan, shall be authorized and approved in all respects, in each case without further action under applicable law, regulation, order or rule, including, without express or implied limitation, any action by the stockholders or directors of the Debtors. On the Effective Date or as soon thereafter as is practicable, Reorganized IT Group shall file with the Secretary of State of the State of Delaware its New Charter (if applicable). On the Effective Date, any other matters provided under the Plan involving the corporate structure of the Debtors or corporate action by the Debtors shall be deemed to have occurred, be authorized, and shall be in effect from and after the Effective Date without requiring further action under applicable law, regulation, order or rule, including, without express or implied limitation, any action by the stockholders or directors of the Debtors.

**7.32    Effectuating Documents and Further Transactions**

Each of the officers of the Debtors and/or Reorganized IT Group or the Litigation Trust Trustee (if applicable) is authorized, in accordance with his or her authority under the resolutions of the boards of directors, to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and provisions of the Plan.

## ARTICLE VIII.
## PROCEDURES FOR RESOLVING
## AND TREATING CONTESTED CLAIMS

**8.1    Objection Deadline**

As soon as practicable, but in no event later than one hundred and eighty (180) days after the Effective Date (subject to being extended by the Bankruptcy Court upon motion of the Disbursing Agent without notice or a hearing), objections to Claims shall be filed with the Bankruptcy Court and served upon the holders of each of the Claims to which objections are made.

**8.2    Prosecution of Contested Claims**

The Disbursing Agent may object to the allowance of Claims filed with the Bankruptcy Court with respect to which liability is disputed in whole or in part. All objections that are filed and prosecuted as provided herein shall be litigated to Final Order or compromised and settled in accordance with Section 8.3 of the Plan.

**8.3    Claims Settlement Guidelines**

Notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, from and after the Effective Date all Claims may be compromised and settled by the Disbursing Agent according to the following procedures:

(a)    Subject to Subsection 8.3(b) of the Plan, the following settlements or compromises do not require the review or approval of the Bankruptcy Court or any other party in interest:

(i)    The settlement or compromise of a Claim pursuant to which such Claim is Allowed in an amount of $250,000 or less; and

(ii)    The settlement or compromise of a Claim where the difference between the amount of the Claim listed on the Debtors' Schedules and the amount of the Claim proposed to be Allowed under the settlement is $250,000 or less; and

(b)    The following settlements or compromises shall be submitted to the Bankruptcy Court for approval:

(i)    Any settlement or compromise not described in subsection 8.3(a) of the Plan; and

(ii)    Any settlement or compromise of a Claim that involves an "insider," as defined in section 101(31) of the Bankruptcy Code.

**8.4    No Distributions Pending Allowance**

Notwithstanding any other provision of the Plan, no payment or Distribution shall be made with respect to any Claim to the extent it is a Contested Claim, unless and until such Contested Claim becomes an Allowed Claim, subject to the Debtors' setoff rights as provided in Section 13.17 of the Plan. All cash or other

property that would have otherwise have been distributed with respect to a Contested Unsecured Claim shall be transferred to the Contested Unsecured Claims Reserve and maintained by the Disbursing Agent in accordance with the principles of this Article VIII.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Disbursing Agent of a private letter ruling if the Disbursing Agent so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Disbursing Agent), the Disbursing Agent shall (i) treat the Contested Unsecured Claims Reserve as a discrete trust for federal income tax purposes, consisting of separate and independent shares to be established in respect of each Contested Unsecured Claim, in accordance with the trust provisions of the Internal Revenue Code (sections 641 et seq.) and (ii) to the extent permitted by applicable law, report consistently for state and local income tax purposes. In addition, pursuant to the Plan, all parties (including holders of Contested Unsecured Claims) shall report, for tax purposes, consistently with such treatment. The Disbursing Agent may request an expedited determination of taxes of the Contested Unsecured Claims Reserve, under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of the Contested Unsecured Claims Reserve for all taxable periods through the dissolution of the Contested Unsecured Claims Reserve.

### 8.5    Distributions After Allowance

Payments and Distributions to each holder of a Contested Claim, to the extent that such Claim ultimately becomes Allowed, shall be made in accordance with the provision of the Plan governing the class of Claims to which the Allowed Claim belongs. No interest shall be paid on account of a Contested Claim which later becomes an Allowed Claim.

### 8.6    Estimation of Claims

The Disbursing Agent may, at any time, request that the Bankruptcy Court estimate any contingent, unliquidated or Contested Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Disbursing Agent has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Contested Claim, that estimated amount shall constitute either the allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Disbursing Agent may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

### ARTICLE IX.
### CONDITIONS PRECEDENT TO
### CONFIRMATION OF THE PLAN AND
### THE OCCURRENCE OF THE EFFECTIVE DATE

### 9.1    Conditions Precedent to Confirmation

The following are conditions precedent to confirmation of the Plan:

(a)    The Clerk of the Bankruptcy Court shall have entered an order or orders, which may be the Confirmation Order, approving the Plan Documents, authorizing the Debtors to execute, enter into and deliver the Plan Documents and to execute, implement and to take all actions otherwise necessary or appropriate to give effect to, the transactions contemplated by the Plan and the Plan Documents.

(b)    The Confirmation Order shall be, in form and substance, acceptable to the Plan Proponents and the Agent.

B    252

## 9.2    Conditions Precedent to the Occurrence of the Effective Date

The following are conditions precedent to the occurrence of the Effective Date:

(a)    The Confirmation Order shall have been entered by the Clerk of the Bankruptcy Court, be in full force and effect and not be subject to any stay or injunction.

(b)    All necessary consents, authorizations and approvals shall have been given for the transfers of property and the payments provided for or contemplated by the Plan, including, without limitation, satisfaction or waiver of all conditions to the obligations of the Debtors under the Plan and the Plan Documents.

## 9.3    Waiver of Conditions

The Committee and the Agent may waive any of the conditions set forth in Sections 9.1 and 9.2 of the Plan in writing.

## 9.4    Effect of Failure of Conditions to Effective Date

In the event the conditions specified in Section 9.2 of the Plan have not been satisfied or waived, and upon written notification submitted by the Plan Proponents or the Agent to the Bankruptcy Court, (a) the Confirmation Order shall be vacated; (b) no Distributions under the Plan shall be made; (c) the Debtors and all holders of Claims and Equity Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred; and (d) all of the Debtors' obligations with respect to the Claims and Equity Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors, the Committee, the Prepetition Lenders or any other entity in any further proceedings involving the Debtors.

## ARTICLE X.
## THE DISBURSING AGENT

## 10.1    Powers and Duties

Pursuant to the terms and provisions of the Plan, the Disbursing Agent shall be empowered and directed to (a) take all steps and execute all instruments and documents necessary to make Distributions to holders of Allowed Claims; (b) make distributions contemplated by the Plan; (c) comply with the Plan and the obligations thereunder; (d) employ, retain, or replace professionals to represent it with respect to its responsibilities; (e) object to Claims as specified in Article VIII of the Plan, and prosecute such objections; (f) make such periodic reports as requested by the Oversight Committee with respect to the status of Distributions under the Plan; and (h) exercise such other powers as set forth in the Plan or as requested by the Oversight Committee.

## 10.2    Distributions

Pursuant to the terms and provisions of the Plan, the Disbursing Agent shall on the applicable Distribution Date, make the required Distributions specified under the Plan. Notwithstanding the foregoing, the Disbursing Agent may make Distributions under the Plan to holders of Allowed General Unsecured Claims at such times as the Disbursing Agent (in consultation with the Committee Designees) reasonably determines the making of such Distributions are practicable in light of any Estimated Claims Order or other unresolved issues affecting Distributions to such holders.

## 10.3    Exculpation

Except as otherwise provided in this Section 10.3 and in addition to Section 13.5 of the Plan, the Disbursing Agent, together with its officers, directors, employees, agents and representatives are hereby exculpated by all Persons, holders of Claims and Equity Interests, and all other parties in interest, from any and all Causes of

Action, and other assertions of liability (including breach of fiduciary duty) arising out of the discharge of the powers and duties conferred upon the Disbursing Agent by the Plan, any Final Order of the Bankruptcy Court entered pursuant to or in the furtherance of the Plan, or applicable law, except solely for actions or omissions arising out of the Disbursing Agent's willful misconduct or gross negligence. No holder of a Claim or an Equity Interest, or representative thereof, shall have or pursue any claim or cause of action against the Disbursing Agent or its officers, directors, employees, agents and representatives for making payments or Distributions in accordance with the Plan. Nothing contained in this Section 10.3 shall preclude or impair any holder of an Allowed Claim from bringing an action in the Bankruptcy Court to compel the making of Distributions contemplated by the Plan on account of such Allowed Claim.

## ARTICLE XI.
### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

#### 11.1    Assumption of Executory Contracts and Unexpired Leases

Pursuant to section 365 of the Bankruptcy Code, Exhibit 2 to the Plan sets forth a list of executory contracts and unexpired leases, together with the amount, if any, required to cure any defaults, to be assumed under the Plan by the Debtors. Subject to the occurrence of the Effective Date, any executory contracts or unexpired leases listed on Exhibit 2 to the Plan, as such may be amended prior to the Confirmation Hearing, shall be deemed to have been assumed by the Debtors on the Effective Date. The Plan shall constitute a motion to assume such executory contracts and unexpired leases. Subject to the occurrence of the Effective Date, the Confirmation Order shall constitute approval of such assumptions pursuant to section 365 of the Bankruptcy Code and findings by the Bankruptcy Court that the amounts listed on Exhibit 2 are sufficient to cure any defaults that may exist, that each assumption is in the best interest of the Debtors, their estates and all parties in interest in the Chapter 11 Cases and that the requirements for assumption of such executory contracts or unexpired leases under section 365 of the Bankruptcy Code have been satisfied. Except as otherwise provided in the following sentence, all cure payments which may be required by section 365(b)(1) of the Bankruptcy Code under any executory contract or unexpired lease which is assumed under the Plan shall be made by the Debtors on the Effective Date or as soon as practicable thereafter. In the event of a dispute, cure payments required by section 365(b)(1) of the Bankruptcy Code shall be paid upon entry of a Final Order resolving such dispute. At this time, no executory contracts or unexpired leases have been identified in Exhibit 2, but the Plan Proponents reserve the right to identify any such contracts or leases prior to the Confirmation Hearing.

Pursuant to section 365 of the Bankruptcy Code, Exhibit 3 to the Plan sets forth a list of executory contracts and unexpired leases, together with the amount, if any, required to cure any defaults, to be assumed under the Plan by the Debtors and assigned to the IT Environmental Liquidating Trust. Any executory contracts or unexpired leases listed on Exhibit 3 to the Plan, as such may be amended prior to the Confirmation Hearing, shall be deemed to have been assumed by the Debtors and assigned to the IT Environmental Liquidating Trust on and subject to the occurrence of the Effective Date. The Debtors are relieved of any liability with respect to the executory contracts and unexpired leases listed on Exhibit 3 to the Plan pursuant to section 365(k) of the Bankruptcy Code. In addition, the IT Environmental Liquidating Trust shall satisfy all of the Debtors' obligations to cure defaults and compensate for damages with respect to any of the executory contracts and unexpired leases listed on Exhibit 3 to the Plan pursuant to section 365(b) of the Bankruptcy Code.

#### 11.2    Rejection of Executory Contracts and Unexpired Leases

Any executory contracts or unexpired leases of any of the Debtors that (a) are not listed on Exhibits 2 or 3 to the Plan; (b) have not been approved by the Bankruptcy Court prior to the Confirmation Date for assumption and assignment by any of the Debtors or rejection by any of the Debtors; and (c) are not the subject of pending motions to assume on the Confirmation Date shall be deemed to have been rejected by the Debtors effective as of the Effective Date. Notwithstanding the forgoing, the assumption and assignment of the operating agreement of Space Gateway Support LLC shall be completed pursuant to the Bankruptcy Court's order dated June 20, 2002 (docket number 1733). The Plan shall constitute a motion to reject all such executory contracts and unexpired leases, and the Debtors shall have no liability thereunder except as is specifically provided in the Plan. The Confirmation Order shall constitute approval of such rejections pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such rejected executory contract or unexpired lease is burdensome

and that the rejection thereof is in the best interest of the Debtors, their estates, and all parties in interest in the Chapter 11 Cases.

**11.3    Claims Arising from Rejection or Termination**

Claims created by the rejection of executory contracts or unexpired leases or the expiration or termination of any executory contract or unexpired lease prior to the Confirmation Date must be filed with the Bankruptcy Court and served on the Debtors (a) in the case of an executory contract or unexpired lease rejected by the Debtors prior to the Confirmation Date, in accordance with the later of the Bar Date Order or thirty (30) days after the date of the order of the Bankruptcy Court authorizing and approving such rejection, or (b) in the case of an executory contract or unexpired lease that (i) was terminated or expired by its terms prior to the Confirmation Date, or (ii) is deemed rejected pursuant to Section 11.2 of the Plan, no later than thirty (30) days after the Confirmation Date, or (c) in the case of an executory contract or unexpired lease that is rejected by the Debtors after the Confirmation Date, within thirty (30) days after the date of the order of the Bankruptcy Court authorizing and approving such rejection. Any Claims for which a proof of claim is not filed and served within such time shall be forever barred from assertion and shall not be enforceable against the Debtors, Reorganized IT Group, the Litigation Trust, or their respective estates, assets, properties, or interests in property. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims under the Plan subject to objection as provided in the Plan.

### ARTICLE XII.
### RETENTION OF JURISDICTION

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall retain and shall have exclusive jurisdiction over any matter (a) arising under the Bankruptcy Code; (b) arising in or related to the Chapter 11 Cases, the Plan or the Litigation Trust; or (c) that relates to any of the following:

(i)    To hear and determine any and all motions or applications pending on the Confirmation Date or thereafter brought in accordance with Article XI of the Plan for the assumption and/or assignment or rejection of executory contracts or unexpired leases to which any of the Debtors is a party or with respect to which any of the Debtors may be liable, and to hear and determine any and all Claims resulting therefrom or from the expiration or termination of any executory contract or unexpired lease;

(ii)    To determine any and all adversary proceedings, applications, motions and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted after the Effective Date, including, without express or implied limitation, any Avoidance Actions or Estate Causes of Action;

(iii)    To hear and determine any objections to the allowance of Claims, whether filed, asserted, or made before or after the Effective Date, including, without express or implied limitation, to hear and determine any objections to the classification of any Claim and to allow, disallow or estimate any Contested Claim in whole or in part;

(iv)    To issue such orders in aid of execution of the Plan to the extent authorized or contemplated by section 1142 of the Bankruptcy Code;

(v)    To consider any modifications of the Plan, remedy any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(vi)    To hear and determine all applications for allowances of compensation and reimbursement of expenses of Professional Persons under sections 330 and 331 of the Bankruptcy Code and any other fees and expenses authorized to be paid or reimbursed under the Plan or the Bankruptcy Code;

(vii)    To hear and determine all controversies, suits and disputes that may relate to, impact upon, or arise in connection with the Plan, including the exhibits to the Plan, or the Plan Documents or their interpretation, implementation, enforcement or consummation;

(viii)    To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the Confirmation Order (and all exhibits to the Plan) or its interpretation, implementation, enforcement or consummation;

(ix)    To hear and determine all controversies, suits and disputes that may relate to, impact upon, or arise in connection with the Plan Settlement or its interpretation, implementation, enforcement or consummation;

(x)    To the extent that Bankruptcy Court approval is required, to consider and act on the compromise and settlement of any Claim or cause of action by or against the Debtors' estates;

(xi)    To determine such other matters that may be set forth in the Plan, or the Confirmation Order, or that may arise in connection with the Plan, or the Confirmation Order;

(xii)    To hear and determine matters concerning state, local, and federal taxes, fines, penalties, or additions to taxes for which the Debtors, Reorganized IT Group, the Litigation Trust or the Disbursing Agent may be liable, directly or indirectly, in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(xiii)    To hear and determine all controversies, suits, and disputes that may relate to, impact upon or arise in connection with any setoff and/or recoupment rights of the Debtors or any Person;

(xiv)    To hear and determine all Causes of Action and all controversies, suits and disputes that may relate to, impact upon or arise in connection with Causes of Action;

(xv)    To enter an order or final decree closing the Chapter 11 Cases;

(xvi)    To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(xvii)    To issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation, implementation or enforcement of the Plan or the Confirmation Order; and

(xviii)    To hear and determine any other matters related hereto and not inconsistent with chapter 11 of the Bankruptcy Code.

## ARTICLE XIII.
## MISCELLANEOUS PROVISIONS

### 13.1    Payment of Statutory Fees

All Statutory Fees accrued through and including the Effective Date shall be paid by the Debtors on or before the Effective Date, and after the Effective Date, Reorganized IT Group or the Litigation Trust (if applicable) shall pay all required Statutory Fees in the ordinary course of business.

### 13.2    Discharge of the Debtors

The rights afforded in the Plan and the treatment of all Claims and Equity Interests herein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued thereon from and after the Petition Date, against the Debtors and the

B   256

debtors-in-possession, or any of their Estates, Assets, properties, or interests in property. Except as otherwise provided herein, on the Effective Date, all Claims against and Equity Interests in the Debtors shall be satisfied, discharged, and released in full. The Debtors shall not be responsible for any obligations of the Debtors, except those expressly assumed by any of the Debtors in the Plan. Except as otherwise provided herein, all Persons shall be precluded and forever barred from asserting against the Debtors, Reorganized IT Group, the Litigation Trust, their respective successors or assigns, or their respective Assets, properties, or interests in property any other or further Claims or Equity Interests based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, whether or not the facts of or legal bases therefor were known or existed prior to the Effective Date.

### 13.3    Third Party Agreements; Subordination

The Distributions to the various classes of Claims hereunder shall be in full satisfaction of the right of any Person to levy, garnish, attach or employ any other legal process with respect to such Distributions by reason of any claimed subordination rights or otherwise. On and subject to the occurrence of the Effective Date, all of such rights and any agreements relating thereto shall be canceled and annulled and of no further force or effect. In accordance with section 510(b) of the Bankruptcy Code, a Claim arising from rescission of a purchase or sale of a security of the Debtors or of an Affiliate of the Debtors, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim, shall be subordinated to all Claims that are senior to or equal the Claim or Equity Interest represented by such security, except that if such security is common stock, such Claim has the same priority and treatment as Equity Interests in Class 5

### 13.4    Dissolution of Committee

The appointment of the Committee shall terminate on the later of (a) the Effective Date, and (b) the date the last order of the Bankruptcy Court allowing or disallowing a Fee Claim becomes a Final Order. Upon such termination, the members of the Committee shall thereupon be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to and arising from and in connection with the Chapter 11 Cases, and the Committee shall be deemed dissolved, unless prior thereto the Bankruptcy Court shall have entered an order extending the existence of the Committee.

### 13.5    Exculpation

None of the Plan Proponents, the Agent, the Prepetition Lenders, the Disbursing Agent or any of their respective members, officers, directors, employees, attorneys, advisors, professionals, consultants or agents shall have or incur any liability to any Person for any act or omission in connection with, related to, or arising out of, the Chapter 11 Cases, including, without limitation, the commencement of the Chapter 11 Cases, the negotiation of the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence as determined by Final Order of the Bankruptcy Court, and in all respects shall be entitled to rely upon the advice of counsel and all information provided by other exculpated persons herein without any duty to investigate the veracity or accuracy of such information with respect to their duties and responsibilities under- or in connection with, the Plan.

### 13.6    Title to Assets; Discharge of Liabilities

Except as otherwise provided in the Plan, on the Effective Date, title to all Assets shall vest in Reorganized IT Group or Litigation Trust, if applicable, free and clear of all Claims, Equity Interests, liens, security interests, encumbrances and other interests, and the Confirmation Order shall be a judicial determination of discharge of the liabilities of the Debtors, except as provided in the Plan. Except as otherwise provided in the Plan, all holders of Claims and Equity Interests shall be precluded from asserting against the Debtors, Reorganized IT Group, the Litigation Trust, the Assets or any property dealt with under the Plan, any or other further Claim based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

37

### 13.7  Surrender and Cancellation of Instruments

On the Effective Date, except as otherwise provided in the Plan, all promissory notes, instruments, securities and agreements evidencing a Claim or Equity Interest shall be canceled. At the option of the Disbursing Agent, no Distribution hereunder shall be made to or on behalf of any holder of any Claim (other than a Lender Claim), unless and until such promissory note, instrument, security or agreement is surrendered or the unavailability thereof is reasonably established to the satisfaction of the Disbursing Agent and such holder of a Claim or Equity Interest executes and delivers any documents necessary to release all encumbrances arising under any applicable security agreement or nonbankruptcy law and such other documents as the Disbursing Agent may reasonably request. In accordance with section 1143 of the Bankruptcy Code, any such holder of a Claim (other than a Lender Claim) that fails to surrender or cause to be surrendered such promissory note, instrument, security or agreement or to execute and deliver an affidavit of loss and indemnity reasonably satisfactory to the Disbursing Agent, and, in the event that the Disbursing Agent requests, furnish a bond in form and substance reasonably satisfactory to the Disbursing Agent (including, without limitation, amount), shall be deemed to have forfeited all rights, claims, and interests and shall not participate in any Distribution hereunder (to the extent otherwise entitled).

### 13.8  Notices

Any notices, requests, and demands required or permitted to be provided under the Plan, in order to be effective, shall be in writing (including, without express or implied limitation, by facsimile transmission), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to:   The IT Group, Inc., et al. (including, if applicable the Litigation Trust)
Attention: Plan Administrator
2790 Mosside Boulevard
Monroeville, PA  15146-2792
Telephone: (412) 858-3345
Telecopier: (412) 858-3311

*With a copy to.*

Skadden, Arps, Slate, Meagher & Flom LLP
Attention: Gregg M. Galardi, Esq.
One Rodney Square
PO Box 636
Wilmington, DE 19899
Telephone: (302) 651-3000
Telecopier: (302) 651-3001

and

White & Case LLP
Attention: John K. Cunningham, Esq.
200 South Biscayne Boulevard
Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700
Telecopier: (305) 358-5744

and

The Bayard Firm
Attention: Jeffrey M. Schlerf, Esq.
222 Delaware Ave., 9th Floor
Wilmington, DE 19899
Telephone: (302) 655-5000

Telecopier: (302) 658-6395

*and*

Weil, Gotshal & Manges LLP
Attention: Stephen Karotkin, Esq.
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Telecopier: (212) 310-8007

If to:    Committee and/or Committee Designees

Attention: Marray Hutchison, Co-Chairperson
P.O. Box 2231
Rancho Santa Fe, CA 92067
Telephone: (858) 756-9777
Telecopier: (858) 756-9245

Attention: Daniel Arbess, Co-Chairperson
110 East 59th Street
34th Floor
New York, NY 10017
Telephone: (212) 829-2540
Telecopier: (212) 829-2599

     *With a copy to:*

White & Case LLP
Attention: John K. Cunningham, Esq.
200 South Biscayne Boulevard
Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700
Telecopier: (305) 358-5744

If to:    Agent, Prepetition Lenders and/or Lender Designees
Attention: Marni McManus
Citigroup
250 West Street
8th Floor
New York, NY 10013
Telephone: (212) 816-7461
Telecopier: (212) 816-7736

     *With a copy to:*

Weil, Gotshal & Manges LLP
Attention: Stephen Karotkin, Esq.
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Telecopier: (212) 310-8007

13.9    <u>Headings</u>

     The headings used in the Plan are inserted for convenience only, and neither constitute a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

B   259

### 13.10    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules), the laws of the State of New York, without giving effect to the conflicts of laws principles thereof, shall govern the construction of the Plan and any agreements, documents, and instruments executed in connection with the Plan, except as otherwise expressly provided in such instruments, agreements or documents.

### 13.11    Expedited Determination

The Disbursing Agent is hereby authorized to file a request for expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed with respect to the Debtors through and including the dissolution of the Debtors.

### 13.12    Exemption from Transfer Taxes

Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

### 13.13    Notice of Entry of Confirmation Order and Relevant Dates

Promptly upon entry of the Confirmation Order, the Committee shall publish on behalf of the Plan Proponents as directed by the Bankruptcy Court and serve on all known parties in interest and holders of Claims and Equity Interests in accordance with Bankruptcy Rule 3020(c)(2), notice of the entry of the Confirmation Order and all relevant deadlines and dates under the Plan, including, but not limited to, the deadline for filing notice of Administrative Claims (Section 5.1 of the Plan), and the deadline for filing rejection damage claims (Section 11.3 of the Plan).

### 13.14    No Interest or Attorneys' Fees

Except as expressly stated in the Plan, or as allowed by the Bankruptcy Court, no interest, penalty or late charge arising after the Petition Date, and no award or reimbursement of attorneys' fees or related expenses or disbursements, shall be allowed on, or in connection with, any Claim.

### 13.15    Modification of the Plan

The Plan Proponents may alter, amend, or modify the Plan or any exhibits under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date, provided all Plan Proponents and the Agent have agreed to such alteration, amendment or modification. The Plan Proponents (with the consent of the Agent) may modify the Plan at any time after confirmation and before substantial consummation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modifications. A holder of a Claim that has accepted or rejected the Plan shall be deemed to have accepted or rejected, as the case may be, such Plan as modified, unless, within the time fixed by the Bankruptcy Court, such holder changes its previous acceptance or rejection.

### 13.16    Revocation of Plan

The Plan Proponents (with the consent of the Agent) reserve the right to revoke and withdraw the Plan as to any Debtor prior to the occurrence of the Effective Date. If the Plan Proponents (with the consent of the Agent) revoke or withdraw the Plan as to any Debtor, or if the Effective Date does not occur as to any Debtor, then, as to such Debtor the Plan and all settlements set forth in the Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any Claims against or Equity Interests in such

Debtor or to prejudice in any manner the rights of the Debtors or any Person in any other further proceedings involving such Debtor

### 13.17    Setoff Rights

Except as provided elsewhere herein, in the event that the Debtors have a claim of any nature whatsoever against the holder of a Claim, the Debtors, Reorganized IT Group or, if applicable, the Litigation Trust, may, but are not required to, setoff against the Claim (and any payments or other Distributions to be made in respect of such Claim hereunder) any claims the Debtors may have against the holder. Neither the failure to setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release of any claims that the Debtors have against the holder of a Claim.

### 13.18    Compliance with Tax Requirements

In connection with the Plan, the Debtors, Reorganized IT Group, the Litigation Trust and the Disbursing Agent, as applicable, shall comply with all withholding and reporting requirements imposed by federal, state, local, and foreign taxing authorities, and all Distributions hereunder shall be subject to such withholding and reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any government unit, including income, withholding and other tax obligations, on account of such Distribution. The Disbursing Agent has the right, but not the obligation, to not make a Distribution until such holder has made arrangements satisfactory to the Disbursing Agent for payment of any such tax obligations.

### 13.19    Injunctions

Except as otherwise expressly provided in the Plan, all Persons or entities who have held, hold, or may hold Claims or Equity Interests are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Equity Interest against any of the Debtors, their Estates, Reorganized IT Group, the IT Environmental Liquidating Trust, the IT Environmental Liquidating Trustee, the Litigation Trust or the Assets, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any of the Debtors, their Estates, Reorganized IT Group, the IT Environmental Liquidating Trust, the IT Environmental Liquidating Trustee, the Litigation Trust or the Assets, (c) creating, perfecting, or enforcing any encumbrance of any kind against any of the Debtors, their Estates, Reorganized IT Group, the IT Environmental Liquidating Trust, the IT Environmental Liquidating Trustee, the Litigation Trust or the Assets, or against the property or interests in property of any of the Debtors, their Estates, Reorganized IT Group or the Litigation Trust, and (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from any Debtor or against the property or interests in property of any Debtor, with respect to any such Claims or Equity Interests; provided, however, that the foregoing shall not affect the rights of a party that were obtained pursuant to a Final Order of the Bankruptcy Court granting limited relief from the automatic stay under section 362(d) of the Bankruptcy Code.

### 13.20    Term of Injunctions or Stays

Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 13.21    Injunction Against Interference With Chapter 11 Plan

Upon the entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

### 13.22    Officers and Directors

Notwithstanding anything contained in the Plan to the contrary, nothing in the Plan or Confirmation Order (except as expressly set forth in Section 13.5 of the Plan with respect to post-Petition Date conduct or the decision to commence the Chapter 11 Cases) shall, or shall be deemed to, release, waive or relinquish any rights, claims or Causes of Action that the Debtors, their Estates, Reorganized IT Group, the Litigation Trust or any other Person may have against any current or former officer, director or insider of any of the Debtors (other than Harry J. Soose, Jr., except to the extent of available director and officer insurance coverage). All of such rights, claims and Causes of Action are reserved and preserved.

### 13.23    Binding Effect

The Plan shall be binding upon and inure to the benefit of the Debtors, the holders of all Claims and Equity Interests, and their respective successors and assigns. To the extent any provision of the Disclosure Statement may be inconsistent with the terms of the Plan, the terms of the Plan shall be binding and conclusive.

!

## 13.24   Severability

SHOULD THE BANKRUPTCY COURT DETERMINE THAT ANY PROVISION OF THE PLAN IS UNENFORCEABLE EITHER ON ITS FACE OR AS APPLIED TO ANY CLAIM OR EQUITY INTEREST OR TRANSACTION, THE PLAN PROPONENTS MAY MODIFY THE PLAN IN ACCORDANCE WITH SECTION 13.15 TO REMEDY SUCH UNENFORCEABILITY. SUCH A DETERMINATION OF UNENFORCEABILITY SHALL NOT (A) LIMIT OR AFFECT THE ENFORCEABILITY AND OPERATIVE EFFECT OF ANY OTHER PROVISION OF THE PLAN OR (B) REQUIRE THE RESOLICITATION OF ANY ACCEPTANCE OR REJECTION OF THE PLAN.

Dated:   February 9, 2004

Respectfully submitted,

Official Committee of Unsecured Creditors
of The IT Group, Inc.

By:_____
Daniel Arbess
Title:    Co-Chairperson

By:_____
Murray Hutchison
Title:    Co-Chairperson

The IT Group, Inc.,
as Debtors and debtors-in-possession

By:_____
Harry J. Soose, Jr.
Title:    Chief Operating Officer

LEASE 413133 CTO

B   263

## PLAN EXHIBIT 1

1.   Any claims, rights and causes of action already initiated by the Debtors (including by way of counterclaim or cross-claim) prior to the Effective Date through which the Debtors seek affirmative relief.

2.   Any claims against any person, company or entity that provided or provides insurance to the Debtors for any failure to provide contractual coverage.

3.   Any and all claims under the Debtors' excess coverage insurance policies.

4.   Any and all claims, including claims for contribution, reimbursement or indemnification under any of the Debtors' directors and officers liability policies.

5.   Any and all claims, including claims for contribution, reimbursement or indemnification, under any other policy of insurance, including the Debtors' general liability insurance policies.

6.   Any claims for acts or omissions of the Debtors' (i) present and former officers, directors, insiders and accountants and (ii) prepetition advisors, agents and other professional persons.

7.   Any claims under 11 U.S.C. §§ 510, 542-45, 547-551 and 553, whether such actions are already initiated, to be initiated or initiated subsequent to the Effective Date.

8.   Any other litigation or Causes of Action, whether legal, equitable or statutory in nature, arising out of, or in connection with the Debtors' businesses, assets or operations or otherwise affecting the Debtors, including, without limitation, possible claims against the following types of parties for the following types of claims:

    a.   Possible claims against vendors, customers or suppliers for warranty, indemnity, back charge/setoff issues, overpayment or duplicate payment issues and collections/accounts receivables matters;

    b.   Failure of any persons or parties to fully perform under contracts with the Debtors before the assumption or rejection of the subject contracts;

    c.   Mechanic's lien claims of the Debtors;

    d.   Possible claims for deposits or other amounts owed by any creditor, lessor, utility, supplier, vendor, factor or other person;

    e.   Possible claims for damages or other relief against any party arising out of employee, management or operational matters;

    f.   Possible claims for damages or other relief against any party arising out of financial reporting;

    g.   Possible claims for damages or other relief against any party arising out of environmental and product liability matters; and

h.    Possible claims against local, state and federal taxing authorities (including, without limitation, any claims for refunds of overpayments).

9.    Any other Causes of Action.

THE PLAN PROPONENTS RESERVE THE RIGHT TO AMEND THIS EXHIBIT TO INCLUDE ADDITIONAL CLAIMS AND CAUSES OF ACTION. THIS EXHIBIT IS NOT INTENDED TO BE AN EXHAUSTIVE LIST OF THE CLAIMS, CAUSES OF ACTION, SUITS OR PROCEEDINGS, WHETHER IN LAW OR EQUITY, WHETHER KNOW OR UNKNOWN, THAT THE DEBTORS, THEIR ESTATES, SUCCESSORS OR ASSIGNS MAY HOLD AGAINST ANY PERSON, WHICH ARE RETAINED PURSUANT TO THE PLAN

CLAIMS RELEASED PURSUANT TO THE PLAN SETTLEMENT SHALL NOT BE RETAINED.

## PLAN EXHIBIT 2

### Executory Contracts and Unexpired Leases
### to be Assumed by the Debtors

At this time, no executory contracts or unexpired leases have been identified in Exhibit 2, but the Plan Proponents reserve the right to identify any such contracts or leases prior to the Confirmation Hearing.

MAR 43831 (2E)

( )

○

○

SCALE 423333 (2X)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
- - - - - - - - - - - - - - - - - - - - - - - - -  x
In re:                              :        Chapter 11
                                    :
THE IT GROUP, INC.,                 :        Case No. 02-10118 (MFW)
  et al.,                           :        Jointly Administered
                                    :
                  Debtors.          :
- - - - - - - - - - - - - - - - - - - - - - - - -  x
```

### NOTICE OF OCCURRENCE OF EFFECTIVE DATE
### PURSUANT TO THE JOINT CHAPTER 11 PLAN OF
### THE IT GROUP AND ITS AFFILIATED DEBTORS PROPOSED BY
### THE DEBTORS AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS

PLEASE TAKE NOTICE THAT:

1.    On April 5, 2004, the United States Bankruptcy Court for the District of Delaware

entered an order confirming the First Amended Joint Chapter 11 Plan for The IT Group, Inc., et

al. and its Affiliated Debtors proposed by the Debtors and the Official Committee of Unsecured

Creditors (the "Plan") appointed in the above-captioned jointly administered chapter 11 cases.

2.    On April 30, 2004, the Effective Date (as such term is defined in the Plan)

occurred pursuant to the Plan. This Notice constitutes notice of the Effective Date for purposes

of the Plan and the Confirmation Order.

John K. Cunningham, Esq            Gregg M. Galardi, Esq
Ileana Cruz, Esq.                  Marion M. Quirk, Esq.
White & Case LLP                   Skadden, Arps, Slate, Meager & Flom, LLP
Wachovia Financial Center, Suite 4900   One Rodney Square
200 South Biscayne Boulevard       Wilmington, DE 19899
Miami, Florida 33131-2352
                                   Counsel for the Debtors
- and -

Jeffrey M. Schlerf, Esq
Eric M. Sutty, Esq.
The Bayard Firm LLP
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19801

Co-Counsel for the Official Committee
of Unsecured Creditors



**State of New Jersey**
OFFICE OF ADMINISTRATIVE LAW

**ORDER**

**ADMISSION TO INACTIVE LIST**

OAL DKT. NO. ESA 6949-02

AGENCY DKT NO. 0820-94-0013

NEW JERSEY DEPARTMENT OF
ENVIRONMENTAL PROTECTION,
    Petitioner,

       v

LANDBANK,
    Respondent.

          Kathrine Hunt, Deputy Attorney General, for petitioner (Peter C. Harvey, Attorney
          General of New Jersey, attorney)

          John Cunningham, Esq., for respondent

BEFORE W. TODD MILLER, ALJ

       This matter was transmitted to the Office of Administrative Law on October 30, 2002, for
a hearing pursuant to *N.J.S.A* 52:14B-1 to -15

       On January 13, 2005, the parties requested that the matter be listed inactive for a period
of six (6) months  Respondent has a matter pending in the United States Bankruptcy Court
which stays all other pending matters  Petitioner was appealing the Bankruptcy Court's Order
barring enforcement of DEP regulations, the basis of this matter.

       At the expiration of six months, on July 27, 2005, during a telephone conference call, the
parties advised the undersigned ALJ that the Bankruptcy Court decision rendered was being

OAL DKT NO. ESA 6949-02

appealed to the United States District Court. Accordingly, the parties requested that this matter be continued on the inactive list for an additional period of six (6) months.

There is no objection to continuing the matter on the inactive list for a period of six (6) months

I CONCLUDE that this matter should be continued on the inactive list for a period of six (6) months

I hereby ORDER the Clerk of the Office of Administrative Law to place this matter on the inactive list for a period of six (6) months, after which it shall be scheduled for a telephone status conference on February 2, 2006, at 3:30 P.M.

I FURTHER ORDER the parties to notify the undersigned ALJ in the event a decision is received from the United States District Court prior to the telephone status conference scheduled herein, at which time this ALJ will schedule a telephone management conference for this matter.

This order may be reviewed by the COMMISSIONER OF THE DEPARTMENT OF ENVIRONMENTAL PROTECTION upon interlocutory review pursuant to N.J.A.C. 1:1-14.10.

7/27/05
DATE

W. TODD MILLER, ALJ

sd

2